In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 11-2332, 11-3258

PATRICIA A. MUSCARELLO,

*Plaintiff-Appellant*,

*v.*

WINNEBAGO COUNTY BOARD, *et al*.,

*Defendants-Appellees*.

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 10 C 50010—**Frederick J. Kapala**, *Judge*.

ARGUED SEPTEMBER 11, 2012—DECIDED DECEMBER 7, 2012

Before BAUER, POSNER, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff owns three tracts of land zoned agricultural in Winnebago County, Illinois. Her suit attacks on a variety of grounds, both federal and state, a 2009 amendment to the County's zoning ordinance that makes it easier than it was before the amendment for an owner of such property to obtain permission to build a wind farm on it. She worries that a wind farm on land adjacent to property of hers would

damage the property in a rather frightening variety of ways, including depriving the property "of the full extent of the kinetic energy of the wind and air as it enters" the property; subjecting it to "shadow flicker and reduction of light," "severe noise," "possible 'ice throw'" (from buildup of ice on spinning blades), and "'blade throws'" (the blades of the windmill might fly off while spinning); interfering with radar, cell phone, GPS, television, and other wireless communications; creating an increased likelihood of lightning damage and stray voltage; increasing electromagnetic radiation; preventing crop dusting (presumably the concern is that crop-dusting aircraft might be endangered by the wind turbines); drying out her land; and killing raptors, thus compelling her to use more pesticides. Some of the feared harms—such as noise, ice throw, blade throw, shadow flicker (like a strobe light), and death of birds—are indeed potential side effects of wind farms. See, e.g., Susan Combs, Texas Comptroller of Public Accounts, "The Energy Report 2008: Wind Energy," www.window.state.tx.us/specialrpt/ energy/renewable/wind.php (all websites cited in this opinion were visited on Nov. 6, 2012); Carl Herbrandson & Rita B. Messing, Minnesota Department of Health, "Public Health Impacts of Wind Turbines," May 22, 2009, www.health.state.mn.us/divs/eh/hazardous/topics/windt urbines.pdf; American Wind Energy Association, *Wind Energy Siting Handbook* 5-33 to 5-48 (2008), www.awea.org/ sitinghandbook/overview.html; National Academy of Sciences, "Impacts of Wind Energy on Human Development," *Environmental Impacts of Wind Projects* 157-62 (2007), www.nap.edu/catalog/11935.html; Scott Larwood, Califor-

nia Wind Energy Collaborative, "Permitting Setbacks for Wind Turbines in California and the Blade Throw Hazard" 27 (June 16, 2005), http://newgenerationdri. capecodcommission.org/ng480.pdf.

A reduction in wind speed downwind is an especially common effect of a wind turbine. Kimberly E. Diamond & Ellen J. Crivella, "Wind Turbine Wakes, Wake Effect Impacts, and Wind Leases: Using Solar Access Laws as the Model for Capitalizing on Wind Rights During the Evolution of Wind Policy Standards," 22 *Duke Environmental L. & Policy Forum* 195, 199-200 (2011). And that is the harm the plaintiff emphasizes—which is odd. For the only possible harm the wind farm could do to her would be to reduce the amount of wind energy otherwise available to her, and the only value of that energy would be to power a wind farm on her property—and she is opposed to wind farming.

Some of the harms to which wind farms are sometimes thought to give rise—interference with electronic communication, lightning damage, and electromagnetic radiation—are conjectural. American Wind Energy Association, *supra*, at 5-49 to 5-54; National Academy of Sciences, *supra*, at 169-73. Even noise, an unquestioned byproduct of wind farming, has no adverse effect on most *agricultural* activity; and the plaintiff does not live on any of the properties involved in this case. Moreover, there's nothing in the record about what agricultural activities are conducted on her properties, or indeed whether any are, and so there's no basis in the record for assessing harm present or prospective to her prop-

erties from the possibility that a wind farm may someday be built nearby.

The suit is against the County Board, the County Zoning Board of Appeals, and some County officials, and also against several affiliated companies that operate wind farms. But no relief is sought against the companies, none of which has yet applied for a permit to build a wind farm in the county, let alone on land adjacent to any of her properties. She alleges, however, that the companies have plans to build a wind farm adjacent to one of her properties. But we'll ignore the private defendants (the companies)—they should not be parties, as no relief is sought against them. And as far as the County defendants are concerned, we can further simplify our opinion, without affecting our analysis, by pretending that the County Board is the only defendant; for the Zoning Board has only an advisory function. See 55 ILCS 5/5-12007, -12009.5.

The district court dismissed the suit, a blunderbuss of federal and state claims, on the ground that the complaint fails to state any claim on which the plaintiff would be entitled to relief. Fed. R. Civ. P. 12(b)(6). Her brief cites diversity of citizenship as the basis for federal jurisdiction over her state claims. She is a citizen of Arizona, and none of the defendants is, so there is complete diversity—but it doesn't matter, because her state claims are within the federal courts' supplemental jurisdiction, 28 U.S.C. § 1367, as well as the diversity jurisdiction.

The same district judge had earlier dismissed a similar suit by the same plaintiff against officials of another Illinois

county in which she owns property, and in *Muscarello v. Ogle County Board of Commissioners*, 610 F.3d 416 (7th Cir. 2010), we affirmed that dismissal. We reached none of her state law claims in that case, however, and anyway it involved a different amendment to a different county's zoning ordinance—an amendment that allowed wind farms only if authorized by special-use permits, just as Winnebago County's zoning ordinance did before the 2009 amendment challenged in this case. We held that the grant of a special-use permit for a wind farm to be built next to the plaintiff's property was not a taking. The wind farm had not yet been built, so no harm to her property had yet been done, although, the permit having been granted, the harms she anticipates from wind farming were more imminent than they are in this case.

Under the Winnebago County ordinance before it was amended in 2009, a property owner had to run an elaborate procedural gauntlet in order to obtain a special-use permit for a wind farm. See 55 ILCS 5/5-12009.5; Winnebago County Code of Ordinances, ch. 90, art. II, § 90-39. The 2009 amendment made wind farms a permitted use, *id*., art. X, § 90-353; and although a wind farm cannot be built before a zoning clearance and a building permit are obtained, *id*., § 90-354, a zoning clearance requires merely a demonstration of compliance with the zoning code, *id*. art. II, § 90-73, and obtaining a building permit presumably is routine. So the amendment made it easier to build a wind farm in the county, and that at bottom is the plaintiff's gripe, as she is a pertinacious foe of wind farms.

The ordinance was further amended in 2011, mainly to add provisions for environmental protection and increase the setback of wind turbines from property lines; that should have alleviated some of the plaintiff's concerns with wind farms, but apparently has not done so.

No one has yet applied for a zoning clearance or building permit for a wind farm in Winnebago County, and no wind farm has yet been built anywhere in the county. As a result, a pall of prematurity hangs over the case. But injury need be neither certain nor great to confer standing under Article III of the Constitution. *American Bottom Conservancy v. U.S. Army Corps of Engineers*, 650 F.3d 652, 656-58 (7th Cir. 2011); *Brandt v. Village of Winnetka*, 612 F.3d 647, 649-50 (7th Cir. 2010); *Korczak v. Sedeman*, 427 F.3d 419, 422-23 (7th Cir. 2005); compare *Summers v. Earth Island Institute*, 555 U.S. 488, 492-96 (2009); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-64 (1992). If the plaintiff's allegations regarding the prospective dangers from an adjacent wind farm are true or even if they are just widely believed, and if she must wait until a wind farm is built adjacent to one of her properties to proceed at law, she may find it difficult to sell the properties now (even before a wind farm is constructed) at the price they would command were the zoning amendment invalidated.

In fact the complaint alleges that her properties have lost $500,000 in value because of the 2009 ordinance. The number is suspiciously round, and unexplained. But the complaint was dismissed without a hearing on jurisdiction; and given the surprising number of potential

adverse environmental consequences of wind farms (even though the energy they produce is clean and also reduces consumption of fossil fuels and so contributes to U.S. independence from foreign oil supplies), it is not beyond reason that the prospect of having a windmill adjacent to one's property might cause the value of the property to decline. The plaintiff has submitted a map on which, she argues, is marked a wind farm that a company wants to build near one of her properties, and she adds that a wind company once approached her about buying a wind easement from her. The injuries she alleges are speculative but not so speculative as to deny her standing to sue.

Yet it is germane to the merits if not to jurisdiction that no property of the plaintiff's has yet been taken, or will be until and unless a wind farm is built near her property—and probably not even then. A taking within the meaning of the takings clause of the U.S. Constitution has to be an actual transfer of ownership or possession of property, or the enforcement of a regulation that renders the property essentially worthless to its owner. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015-16 (1992); *Muscarello v. Ogle County Board of Commissioners*, *supra*, 610 F.3d at 421-22; *Gamble v. Eau Claire County*, 5 F.3d 285, 286 (7th Cir. 1993). The 2009 Winnebago ordinance does not transfer possession of any of the plaintiff's land or limit her use of it.

The Illinois takings clause, however, on which she also relies, is broader than the federal clause. Article I, section 15 of the state's constitution provides that "property shall not be taken or damaged for public use

without just compensation." "Taken" is defined as under federal law, *Forest Preserve District v. West Suburban Bank*, 641 N.E.2d 493, 497 (Ill. 1994), but "damaged" connotes merely "a direct physical disturbance" of the plaintiff's property that causes a loss of value. *Patzner v. Baise*, 552 N.E.2d 714, 716-18 (Ill. 1990); *Equity Associates, Inc. v. Village of Northbrook*, 524 N.E.2d 1119, 1124 (Ill. App. 1988); *International College of Surgeons v. City of Chicago*, 153 F.3d 356, 367-68 (7th Cir. 1998) (Illinois law). But as no wind farm has yet been built, there has been no direct, or for that matter indirect, physical disturbance of the plaintiff's property.

She further contends, however, that by making it easier for her neighbors to build wind farms, the amended ordinance has deprived her of property without due process of law, in violation of the Fourteenth Amendment and the corresponding provision in the Illinois constitution. The word "property" in the due process clause is defined broadly, and includes for example liquor licenses and tenured employment contracts, rather than just real estate and other tangible property. *Perry v. Sindermann*, 408 U.S. 593, 601-03 (1972); *Patterson v. Portch*, 853 F.2d 1399, 1405-08 (7th Cir. 1988); *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983); *Greenwood v. New York*, 163 F.3d 119, 122-23 (2d Cir. 1998); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1156-58 (4th Cir. 1991). But all she's challenging is a change in the *procedure* by which the owner of adjacent property can get permission to build a wind farm. The harm caused her by a change in the procedural

rights of other landowners—a change that imposes no restriction on her use of her land—is too remote to count as a deprivation of property. See *Muscarello v. Ogle County Board of Commissioners*, *supra*, 610 F.3d at 423; *People ex rel. Klaeren v. Village of Lisle*, 781 N.E.2d 223, 230 (Ill. 2002); cf. *Passalino v. City of Zion*, 928 N.E.2d 814, 818-19 (Ill. 2010). At worst, it raises the spectre of some future deprivation; and the due process clause does not protect against spectres.

Her attack on the legality of the amended ordinance fails for a more fundamental reason. The wind farm ordinance is legislation. It applies throughout the county and thus to many different properties owned by different people having different interests. Some property owners want to be permitted to build wind farms—otherwise the ordinance would not have been amended to make it easier for them to obtain permission—and at least one does not. "Cities [and other state and local governments, including counties] may elect to make zoning decisions through the political process" rather than having to "use adjudicative procedures to make" such decisions. *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166 (7th Cir. 1994); see *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 676-79 (1976); *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467-68 (7th Cir. 1988). "Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption." *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445 (1915) (Holmes, J.).

These are cases interpreting federal law, but we are given no reason to think that Illinois law is different. Adjudicative procedures would not be workable in a case like this. Evaluating the plaintiff's objections to the ordinance would require comprehensive knowledge not only of wind farms and their effects pro or con on the environment and on energy independence, but also of the most valuable potential uses of all rural land in the county. A judge could review the ordinance for rationality, *Napleton v. Village of Hinsdale*, 891 N.E.2d 839, 852 (Ill. 2008); *Thornber v. Village of North Barrington*, 747 N.E.2d 513 (Ill. App. 2001), but that is an undemanding test, and the national interest in wind power as a clean source of electrical energy and as a contribution to energy independence is enough to establish the ordinance's rationality. (There is federal money to support wind farms; why shouldn't Winnebago County try to get a bit of it by making it easier to build wind farms in the county?) For a court to allow a hypothetical harm to one person's property from a yet to be built (or even permitted to be built) wind farm to upend a county-wide ordinance would be an absurd judicial intrusion into the public regulation of land uses.

Stepping down from the dizzying heights of constitutional law, we can restate the plaintiff's contention as simply that a wind farm adjacent to her property would be a nuisance. *In re Chicago Flood Litigation*, 680 N.E.2d 265, 277-78 (Ill. 1997); *Dobbs v. Wiggins*, 929 N.E.2d 30, 38-39 (Ill. App. 2010); *Restatement (Second) of Torts* §§ 821D-E (1979); W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* §§ 87-89, p. 619-42 (5th ed. 1984). That is a more

sensible conceptualization of her claim than supposing as she does that she has a property right in her neighbors' use of their lands. Should any of them create a nuisance by building a wind farm, she can seek to abate the nuisance when the wind farm is built, or maybe a bit earlier, when a permit to build it is granted. The fact that the County Board has zoned agricultural property to allow wind farms would complicate her effort to establish that it was a nuisance, but not defeat it. The operation of the wind farm might turn out to cause a kind or amount of damage that the Board had not foreseen, and in that event the ordinance would not bar the suit. *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1111, 1123-25 (Ill. 2004); *Meyers v. Kissner*, 594 N.E.2d 336, 340 (Ill. 1992); *Woods v. Khan*, 420 N.E.2d 1028, 1030-31 (Ill. App. 1981); *Armory Park Neighborhood Ass'n v. Episcopal Community Services in Arizona*, 712 P.2d 914, 921-22 (Ariz. 1985); *Restatement (Second) of Torts, supra*, §§ 827, 831; Keeton et al., *supra*, § 88B, p. 633.

Sufficient unto the day is the evil thereof. For all one knows, no wind farm will ever be built close enough to any of the plaintiff's properties to do any harm, let alone harm sufficient to constitute a nuisance under the standard for determining nuisance, which involves a balancing of the costs and benefits of the land use claimed to have caused a nuisance. *Village of Wilsonville v. SCA Services, Inc.*, 426 N.E.2d 824, 834-36 (Ill. 1981); *Dobbs v. Wiggins, supra,* 929 N.E.2d at 38-39; *Pasulka v. Koob*, 524 N.E.2d 1227, 1238-39 (Ill. App. 1988); *Restatement (Second) of Torts, supra*, § 826; Keeton et al., *supra*, § 88, p. 629-30. Even a wind farm that was only a stone's

throw from one of her properties might do no damage to it, given the use to which she puts her Winnebago County properties—of which we have not been informed.

A distinct challenge by the plaintiff to the 2009 ordinance is that it was enacted without the three consecutive newspaper notices required by state law. 715 ILCS 5/3. She argues that the ordinance should therefore be enjoined. But the ordinance was re-enacted in 2011, as we mentioned at the outset of this opinion, and that mooted any objection to the violation of the notice statute when the 2009 ordinance was enacted. Maybe the violation was repeated when the current ordinance was enacted, but if so the plaintiff can bring a new suit, challenging its legality.

Yet the re-enactment of the 2009 ordinance in 2011 does not, as the County Board argues, moot the plaintiff's challenge to the substantive provisions of the earlier ordinance (mainly the change of wind farms from special to permitted land uses). These provisions are materially unchanged (although slightly altered in her favor), and an agency cannot by constant re-enactment moot an earlier statute or ordinance. In attacking the 2009 ordinance the plaintiff is implicitly attacking the provisions of it that survived into the 2011 ordinance currently in force.

The term "substantive due process" pops up once in the complaint, but in context refers to the plaintiff's procedural complaints—of which the final one is the County Board's alleged failure to have complied with an Illinois statute requiring "at least one public hearing

more than 30 days prior to a [wind farm] siting decision by the county board." 55 ILCS 5/5-12020. As there has yet to be a siting decision for a wind farm, that challenge is premature—and we doubt that a siting decision (and therefore a public hearing) would be required for a wind farm now that it is a permitted land use.

There is, in sum, no merit to the plaintiff's claim that the ordinance as amended in 2009 violates her constitutional rights. It is a modest legislative encouragement of wind farming and is within the constitutional authority, state as well as federal, of a local government. The judgment of dismissal is therefore

AFFIRMED.