# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 11-3421, 11-3430, 11-3584, 11-3585, 11-3586,
11-3620, 11-3787, 11-3795, 11-3806, 12-1027

ILLINOIS COMMERCE COMMISSION, *et al.*,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

Petitions to Review Orders of the
Federal Energy Regulatory Commission.
Nos. ER10-1791-000, ER10-1791-001, ER10-1791-002

ARGUED APRIL 10, 2013—DECIDED JUNE 7, 2013

Before POSNER, WOOD, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. Control of more than half the nation's electrical grid is divided among seven Regional Transmission Organizations, as shown in Figure 1. These are voluntary associations of utilities that own electrical transmission lines interconnected to form a regional grid and that agree to delegate operational control of the grid to the association. See 18 C.F.R. §§ 35.34(j), (k)(1)(i); *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361,

1363-65 (D.C. Cir. 2004). Power plants that do not own any part of the grid but generate electricity transmitted by it are also members of these associations, as are other electrical companies involved in one way or another with the regional grid.

FIGURE 1

REGIONAL TRANSMISSION ORGANIZATIONS



The RTOs play a key role in the effort by the Federal Energy Regulatory Commission "to promote competition in those areas of the industry amenable to competition, such as the segment that generates electric power, while ensuring that the segment of the industry characterized

by natural monopoly—namely, the transmission grid that conveys the generated electricity—cannot exert monopolistic influence over other areas . . . . To further pry open the wholesale-electricity market and to reduce technical inefficiencies caused when different utilities operate different portions of the grid independently, the Commission has encouraged transmission providers to establish 'Regional Transmission Organizations'—entities to which transmission providers would transfer operational control of their facilities for the purpose of efficient coordination . . . [and] has encouraged the management of those entities by 'Independent System Operators,' not-for-profit entities that operate transmission facilities in a nondiscriminatory manner." *Morgan Stanley Capital Group, Inc. v. Public Utility District No. 1*, 554 U.S. 527, 536-37 (2008).

Two Regional Transmission Organizations are involved in this case—Midwest Independent Transmission System Operator, Inc. (MISO) and PJM Interconnection, LLC (PJM). As shown in Figure 1, MISO operates in the midwest and in the Great Plains states while PJM operates in the mid-Atlantic region but has midwestern enclaves in and surrounding Chicago and in southwestern Michigan.

Each RTO is responsible for planning and directing expansions and upgrades of its grid. It finances these activities by adding a fee to the price of wholesale electricity transmitted on the grid. 18 C.F.R. §§ 35.34 (k)(1), (7). The Federal Power Act requires that the fee be "just and reasonable," 16 U.S.C. § 824d(a), and therefore at least

roughly proportionate to the anticipated benefits to a utility of being able to use the grid. *Illinois Commerce Commission v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009); *Pacific Gas & Electric Co. v. FERC*, 373 F.3d 1315, 1320-21 (D.C. Cir. 2004). Thus "all approved rates [must] reflect to some degree the costs actually caused by the customer who must pay them." *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992). Courts "evaluate compliance [with this principle, which is called 'cost causation'] by comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party." *Midwest ISO Transmission Owners v. FERC*, *supra*, 373 F.3d at 1368.

MISO began operating in 2002 and soon grew to have 130 members. (Unfortunately, the voluminous briefs say little about the association's governance structure.) In 2010 it sought FERC's approval to impose a tariff on its members to fund the construction of new high-voltage power lines that it calls "multi-value projects" (MVPs), beginning with 16 pilot projects. The tariff is mainly intended to finance the construction of transmission lines for electricity generated by remote wind farms. Every state in MISO's region except Kentucky (which is barely in the region, see Figure 1) encourages or even requires utilities to obtain a specified percentage of their electricity supply from renewable sources, mainly wind farms. Indiana, North Dakota, and South Dakota have aspirational goals; the rest have mandates. The details vary but most of the states expect or require utilities to obtain between 10 and 25 percent of their electricity needs from renewable sources by 2025—and by then there may be federal renewable energy requirements as well.

"The dirty secret of clean energy is that while generating it is getting easier, moving it to market is not . . . . Achieving [a 20% renewable energy quota] would require moving large amounts of power over long distances, from the windy, lightly populated plains in the middle of the country to the coasts where many people live. . . The grid's limitations are putting a damper on such projects already." Matthew L. Wald, "Wind Energy Bumps into Power Grid's Limits," *New York Times*, Aug. 27, 2008, p. A1. MISO aims to overcome these limitations.

To begin with, it has identified what it believes to be the best sites in its region for wind farms that will meet the region's demand for wind power. They are the shaded ovals in Figure 2. Most are in the Great Plains, because electricity produced by wind farms there is cheaper despite the longer transmission distance; the wind flow is stronger and steadier and land is cheaper because population density is low (wind farms require significant amounts of land).

FIGURE 2
WIND DEVELOPMENT ZONES AND MVP PROJECTS
(dashed lines are initial proposals,
solid lines approved projects)



MISO has estimated that the cost of the transmission lines necessary both to bring electricity to its urban centers from the Great Plains and to integrate the existing wind farms elsewhere in its region with transmission lines from the Great Plains—transmission lines that the multi-value projects will create—will be more than offset by the lower cost of electricity produced by western wind farms. The new transmission lines will also increase the reliability of the electricity supply in the MISO region and thus reduce brownouts

and outages, and also increase the efficiency with which electricity is distributed throughout the region.

The cost of the multi-value projects is to be allocated among utilities drawing power from MISO's grid in proportion to each utility's share of the region's total wholesale consumption of electricity. Before 2010, MISO allocated the cost of expanding or upgrading the transmission grid to the utilities nearest a proposed transmission line, on the theory that they would benefit the most from the new line. But wind farms in the Great Plains can generate far more power than that sparsely populated region needs. So MISO decided to allocate MVP costs among all utilities drawing power from the grid according to the amount of electrical energy used, thus placing most of those costs on urban centers, where demand for energy is greatest.

FERC approved (with a few exceptions, one discussed later in this opinion) MISO's rate design and pilot projects in two orders (for simplicity we'll pretend they're just one), precipitating the petitions for review that we have consolidated.

Six issues are presented: the proportionality of benefits to costs; the procedural adequacy of the Commission's treatment of proportionality; the propriety of apportioning the cost of the multi-value projects among utilities on the basis of their total power consumption while allocating no MVP costs to the plants that generate the power; whether MISO should be permitted to add the MVP fee to electricity transmitted to utilities that belong to the PJM Regional Transmission Organization

rather than to MISO; whether MISO should be permitted to assess some of the multi-value projects' costs on departing members of MISO; and whether the Commission's approval of the MVP tariff—which if implemented will influence decisions by state utility commissions regarding the siting of transmission lines—violates the Tenth Amendment to the Constitution by invading state prerogatives.

*The Tenth Amendment.* The last issue is frivolous, so we dispatch it first. FERC approved the MVP tariff pursuant to its statutory authority to regulate interstate electrical rates, 16 U.S.C. § 824(a), but (unlike the regulation of natural gas, a field in which FERC has jurisdiction both over pricing and over the siting of interstate lines, see 15 U.S.C. § 717f(c)) the states retain authority over the location and construction of electrical transmission lines. 16 U.S.C. § 824(b)(1); *New York v. FERC*, 535 U.S. 1, 24 (2002). Some of the petitioners complain that FERC's approval of the MVP tariff coerces each state to approve all MVPs proposed within its territory. They argue that since the costs of each project are distributed among all MISO utilities while any local benefits will be retained in the state in which the project is located, a state will deprive itself of the local benefits of a project subsidized by other utilities if it refuses to approve an MVP project.

But this is just to say that the tariff provides a carrot that states won't be able to resist eating; to obtain the benefits of the MVP program each state's MISO members may have to shoulder costs of some specific projects

that they'd prefer not to support. But that's a far cry from the federal government's conscripting a state government into federal service. That it may not do. *National Federation of Independent Businesses v. Sebelius*, 132 S. Ct. 2566, 2601-09 (2012); *New York v. United States*, 505 U.S. 144, 149 (1992); *Printz v. United States*, 521 U.S. 898, 935 (1997). This it may do. Cf. *National Ass'n of Regulatory Utility Commissioners v. FERC*, 475 F.3d 1277, 1282-83 (D.C. Cir. 2007). It's not as if FERC were ordering states to build transmission lines that the federal government wants to use for its own purposes. And to glance ahead a bit, there is nothing to prevent a member of MISO from withdrawing from the association and joining another Regional Transmission Organization.

Five issues remain; we discuss them in the order in which we listed them, beginning with—

*Proportionality and Procedure* (best discussed together). MISO used to allocate the cost of an upgrade to its grid to the local area ("pricing zone") in which the upgrade was located. (There are 24 pricing zones in MISO.) But those were upgrades to low-voltage lines, which transmit power short distances and thus benefit only the local area served by the lines. MISO contends (and FERC agrees) that the multi-value projects, which involve high-voltage lines that transmit electricity over long distances, will benefit all members of MISO and so the projects' costs should be shared among all members.

The petitioners' objections fall into two groups. One consists of objections lodged by the Michigan utilities and their regulator (we'll call this set of objectors

"Michigan"), the other of objections by other petitioners led by the Illinois Commerce Commission. We'll call these objectors "Illinois," though they include other state utilities and regulators; and we'll begin with their objections.

Illinois contends that the criteria for determining what projects are eligible to be treated as MVPs are too loose, and that as a result all MISO members will be forced to contribute to the cost of projects that benefit only a few. To qualify as an MVP a project must have an expected cost of at least $20 million, must consist of high-voltage transmission lines (at least 100kV), and must help MISO members meet state renewable energy requirements, fix reliability problems, or provide economic benefits in multiple pricing zones. None of these eligibility criteria ensures that every utility in MISO's vast region will benefit from every MVP project, let alone in exact proportion to its share of the MVP tariff. For example, Illinois power cooperatives are exempt from the state's renewable energy requirements, 83 Ill. Adm. Code 455.100; 20 ILCS 3855/1-75(c), and so would not benefit from MVPs that help utilities meet state renewable energy requirements. But FERC expects them to benefit by virtue of the criteria for MVP projects relating to reliability and to the provision of benefits across pricing zones.

Bear in mind that every multi-value project is to be large, is to consist of high-voltage transmission (enabling power to be transmitted efficiently across pricing zones), and is to help utilities satisfy renewable energy require-

ments, improve reliability (which benefits the entire regional grid by reducing the likelihood of brownouts or outages, which could occur anywhere on it, *Illinois Commerce Commission v. FERC*, *supra*, 576 F.3d at 477), facilitate power flow to currently underserved areas in the MISO region, or attain several of these goals at once. The 16 projects that have been authorized are just the beginning. And FERC has required MISO to provide annual updates on the status of those projects. Should the reports show that the benefits anticipated by MISO and FERC are not being realized, the Commission can modify or rescind its approval of the MVP tariff.

Illinois also complains that MISO has failed to show that the multi-value projects as a whole will confer benefits greater than their costs, and it complains too about FERC's failure to determine the costs and benefits of the projects subregion by subregion and utility by utility. But Illinois's briefs offer no estimates of costs and benefits either, whether for the MISO region as a whole or for particular subregions or particular utilities. And in complaining that MISO and the Commission failed to calculate the full financial incidence of the MVP tariff, Illinois ignores the limitations on calculability that the uncertainty of the future imposes. MISO did estimate that there would be cost savings of some $297 million to $423 million annually because western wind power is cheaper than power from existing sources, and that these savings would be "spread almost evenly across all Midwest ISO Planning Regions." *Midwest Independent Transmission System Operator, Inc.*, 133 F.E.R.C. 61221, ¶ 34 (2010). It also estimated that the projected high-

voltage lines would reduce losses of electricity in transmission by \$68 to \$104 million, and save another \$217 to \$271 million by reducing "reserve margin losses." *Id.* That term refers to electricity generated in excess of demand and therefore (because it can't be stored) wasted. Fewer plants will have to be kept running in reserve to meet unexpected spikes in demand if by virtue of longer transmission lines electricity can be sent from elsewhere to meet those unexpected spikes. It's impossible to allocate these cost savings with any precision across MISO members.

The promotion of wind power by the MVP program deserves emphasis. Already wind power accounts for 3.5 percent of the nation's electricity, U.S. Energy Information Administration, "What is US Electricity Generation by Source?" May 9, 2013, www.eia.gov/tools/faqs/faq.cfm?id= 427&t=3 (visited May 29, 2013), and it is expected to continue growing despite the downsides of wind power that we summarized in *Muscarello v. Winnebago County Board,* 702 F.3d 909, 910-11 (7th Cir. 2012). The use of wind power in lieu of power generated by burning fossil fuels reduces both the nation's dependence on foreign oil and emissions of carbon dioxide. And its cost is falling as technology improves. No one can know how fast wind power will grow. But the best guess is that it will grow fast and confer substantial benefits on the region served by MISO by replacing more expensive local wind power, and power plants that burn oil or coal, with western wind power. There is no reason to think these benefits will be denied to particular subregions of MISO. Other benefits of MVPs, such as increasing the

reliability of the grid, also can't be calculated in advance, especially on a subregional basis, yet are real and will benefit utilities and consumers in all of MISO's subregions.

It's not enough for Illinois to point out that MISO's and FERC's attempt to match the costs and the benefits of the MVP program is crude; if crude is all that is possible, it will have to suffice. As we explained in *Illinois Commerce Commission v. FERC*, *supra*, 576 F.3d at 477, if FERC "cannot quantify the benefits [to particular utilities or a particular utility] . . . but it has an articulable and plausible reason to believe that the benefits are at least roughly commensurate with those utilities' share of total electricity sales in [the] region, then fine; the Commission can approve [the pricing scheme proposed by the Regional Transmission Organization for that region] . . . on that basis. For that matter it can presume [as it did in this case] that new transmission lines benefit the entire network by reducing the likelihood or severity of outages."

Illinois can't counter FERC without presenting evidence of imbalance of costs and benefits, which it hasn't done. When we pointed this out at oral argument, Illinois's lawyer responded that he could not obtain the necessary evidence without pretrial discovery and that FERC had refused to grant his request for an evidentiary hearing even though the Commission's rules make the grant of such a hearing a precondition to discovery. 18 C.F.R. § 385.504(b)(5). FERC refused because it already had voluminous evidentiary materials, including MISO's elaborate quantifications of costs

and benefits—and these were materials to which the petitioners had access as well; they are, after all, members of MISO. The only information MISO held back was the production costs of particular power plants, which it deemed trade secrets and anyway are only tenuously related to the issue of proportionality. The need for discovery has not been shown; and for us to order it without a compelling reason two and a half years after the Commission rendered its exhaustive decision (almost 400 pages long) would create unconscionable regulatory delay.

Michigan (which is to say Michigan utilities plus the state's electric power regulatory agency) argues that unique features of the state's power system will cause Michigan utilities to pay a share of the MVP tariff greatly disproportionate to the benefits they will derive from the multi-value projects. A Michigan statute, Mich. Comp. L. 460.1029(1), forbids Michigan utilities to count renewable energy generated outside the state toward satisfying the requirement in the state's "Clean, Renewable, and Efficient Energy Act" of 2008 that they obtain at least 10 percent of their electrical power needs from renewable sources by 2015. Michigan further argues that it won't benefit from any multi-value projects constructed in other states because its utilities draw very little power from the rest of the MISO grid, as a consequence of the limited capacity to transmit electricity from Indiana to Michigan. It argues that for these reasons it should be required to contribute only to the costs of multi-value projects built in Michigan.

The second argument founders on the fact that the construction of high-voltage lines from Indiana to Michigan is one of the multi-value projects and will enable more electricity to be transmitted to Michigan at lower cost. Michigan's first argument—that its law forbids it to credit wind power from out of state against the state's required use of renewable energy by its utilities—trips over an insurmountable constitutional objection. Michigan cannot, without violating the commerce clause of Article I of the Constitution, discriminate against out-of-state renewable energy. See *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 100-01 (1994); *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992); *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 595-96 (7th Cir. 1995); Steven Ferrey, "Threading the Constitutional Needle with Care: The Commerce Clause Threat to the New Infrastructure of Renewable Power," 7 *Texas J. Oil, Gas & Energy Law* 59, 69, 106-07 (2012).

Like Illinois, Michigan objects to the Commission's refusal to conduct an evidentiary hearing. It wants an opportunity to present evidence in a trial-type proceeding involving cross-examination of expert witnesses. (All direct testimony at FERC's evidentiary hearings is presented in writing; only cross-examination is oral.) It also wants pretrial discovery, like Illinois. But unlike Illinois it didn't raise the issue until its reply brief, which is too late.

FERC need not conduct an oral hearing if it can adequately resolve factual disputes on the basis of written submissions. *Blumenthal v. FERC*, 613 F.3d 1142, 1144-45

(D.C. Cir. 2010); *California ex rel. Lockyer v. FERC*, 329 F.3d 700, 713 (9th Cir. 2003); *Pacific Gas & Electric Co. v. FERC*, 306 F.3d 1112, 1119 (D.C. Cir. 2002); *Cajun Electric Power Co-op., Inc. v. FERC*, 28 F.3d 173, 176-77 (D.C. Cir 1994) (per curiam); *Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993). Considering the highly technical character of the data and analysis required to match costs and benefits of transmission projects, the technical knowledge and experience of FERC's members and staff, and the petitioners' access to MISO's studies, we would be creating gratuitous delay to insist at this late date on the Commission's resorting to litigation procedures designed long ago for run-of-the-mine legal disputes. Michigan has failed to indicate what evidence that it might present in an evidentiary hearing would contribute to the data and analysis in the record already before the Commission.

A further answer to both the substantive and procedural questions about proportionality is that MISO members who think they're being mistreated by the MVP tariff can vote with their feet. Membership in an RTO is voluntary and though there's a "departure fee" (discussed later in this opinion), it is an unexceptionable feature of membership in a voluntary association, designed to prevent a departing member from reaping a windfall by leaving costs for which it is properly liable to be borne by the remaining members. A departure fee, which if properly calculated just deters windfalls, will not prevent a discontented MISO member from decamping to an adjacent RTO. As shown in the right-hand panel of Figure 3, Michigan abuts the border

between MISO (light gray) and PJM (dark gray) and has claimed that 96.5 percent of its external grid connections are with PJM. It should therefore be able without great difficulty to quit MISO and join PJM. It doesn't want to do that; so far as appears, it is objecting to the MVP program only in the hope of getting better terms.

FIGURE 3:
MISO-PJM BORDER REGION
(MISO to left, PJM to right)

2004                                    2013

 

*Allocation of cost on the basis of peak load versus total electricity consumption.* Because a power grid must be built to handle peak loads (the amount of electricity transmitted when demand is greatest, as on hot summer days), some of the petitioners argue that the MVP surcharge should be allocated according to each utility's contribution to peak demand. The peak demanders would be paying for facilities built to accommodate that demand and thus minimize brownouts and outages. Instead MISO allocates the surcharge by the total amount of electricity that each utility receives over the MISO grid. A higher share of MVP costs is thus allocated to utilities receiving electricity to meet continuous demands, such as the demand by a factory for electricity much of which it uses in off-peak periods.

The objection to MISO's allocating costs by total rather than peak demand is refuted by the fact that a primary goal of the MVPs is to increase the supply of wind-powered energy. The electricity generated by wind farms varies with the amount of wind rather than with demand and therefore is not a reliable source of energy to meet peak demand. That is why the states' renewable energy standards are couched in terms of total energy rather than peak load. See, e.g., 20 ILCS 3855/1-75(c)(2); Wis. Stat. § 196.378(1)(fm); Minn. Stat. § 216B.1691 subd. 2a(a). Furthermore, long-distance power transmission will enable fewer power plants to serve the grid's off-peak demand. True, the projects are also intended to increase the grid's reliability, which is challenged mainly by peak load (which is why outages are more frequent on hot summer days, when everyone is running his air

conditioner at the same time). But MISO and FERC were entitled to conclude that the benefits of more and cheaper wind power predominate over the benefits of greater reliability brought about by improvement in meeting peak demand.

*Allocation of cost between power plants and the wholesale buyers of the power.* Petitioners complain about MISO's decision to allocate all MVP costs to the utilities that buy electricity from its grid and none to the power plants that generate that electricity. Because the power plants are required to pay for connecting to the grid and the multi-value projects will shorten the interconnection distance and thus reduce the cost to the power plants of connecting, the petitioners argue that the power plants should pay part of the MVP tariff. But the utilities benefit from cheaper power generated by efficiently sited wind farms whose development the multi-value projects will stimulate. The MVP tariff allocates to the wholesale buyers some of the costs of conferring these benefits on those buyers, though competition might do the same thing without the tariff because the power plants would pass some of their higher costs on to their customers, the wholesale buyers.

An important consideration is that when wind farms are built in remote areas (which are the best places to site them), the costs of connecting them to the grid are very high, and by reducing those costs the multi-value projects, financed by the MVP tariff, facilitate siting wind farms at the best locations in MISO's region rather than at inefficient ones that are however closer to the

existing grid and so would be preferred by the wind-farm developers if they had to pay for the connection. See *California Independent System Operator Corp.*, 119 F.E.R.C. 61061, ¶¶ 64-67 (2007); *Southwest Power Pool, Inc.*, 127 F.E.R.C. 61283, ¶¶ 5, 11, 28 (2009).

*Export charges to PJM*. An issue that unlike the previous ones finds MISO and FERC at loggerheads is whether the Commission is unreasonable in prohibiting MISO from adding the MVP surcharge to electricity transmitted from its grid to the grid of PJM, an adjoining Regional Transmission Organization. The Commission permits MISO to charge for transmission to other RTOs.

The prohibition arises from a concern with what in FERC-speak is called "rate pancaking" but is more transparently described as exploiting a locational monopoly by charging a toll. It is illustrated by Henrich von Kleist's classic German novella *Michael Kohlhaas*. When the book was published in 1810, what is now Germany was divided into hundreds of independent states. A road from Munich to Berlin, say, would cross many boundaries, and each state that the road entered could charge a toll as a condition for allowing entry. The toll would be limited not by the cost imposed on the state by the traveler, in wear and tear on the road or traffic congestion, but by the cost to the traveler of using a less direct alternative route. See also *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1400 (7th Cir. 1995); cf. *Goulding v. Cook*, 661 N.E.2d 1322, 1325 (Mass. 1996). Like early nineteenth-century Germany, the American electric grid used to be

divided among hundreds of independent utilities, each charging a separate toll for the right to send electricity over its portion of the grid. The multiple charges imposed on long-distance transmission discouraged such transmission. FERC promoted the creation of the Regional Transmission Organizations as a way of eliminating these locational monopolies. *Wabash Valley Power Ass'n v. FERC*, 268 F.3d 1105, 1116 (D.C. Cir. 2001). For it required that the RTOs embrace coherent geographic regions and that each RTO charge a single fee for use of its entire grid. 18 C.F.R. §§ 35.34(j)(2), (k)(1)(ii).

In the early 2000s Commonwealth Edison and American Electric Power had requested FERC's permission to join PJM despite being inside MISO's region (around Chicago and in southwestern Michigan, respectively). The Commission approved their requests yet was concerned that the irregular border (seen in the left-hand panel of Figure 3) between the two regions, by creating PJM enclaves in MISO's region, violated the requirement that RTOs embrace coherent regions. The Commission was concerned for example with Michigan utilities' having to pay PJM charges on power sent from elsewhere in MISO (such as Wisconsin), because those transmissions, though beginning and ending in MISO territory, traversed a PJM enclave—the area served by Commonwealth Edison.

The Commission had another concern with the irregular border, what we'll call the "power routing" concern. Notice in the left-hand panel of Figure 3 the MISO utilities that lie (or rather lay, as of 2004) on a south

to north diagonal in Kentucky and Ohio. Imagine a whole-sale buyer of electricity located on the diagonal. It would be more efficient for it to draw electricity from the PJM transmission lines to its immediate west or east than from the MISO lines that snake to the northeast and thus bring electricity from a great distance. But the buyer might be deflected from the most efficient routing option because buying from PJM would cross both MISO and PJM territory and thus require paying a double toll.

So in 2003 FERC forbade export charges between MISO and PJM and ordered the two RTOs to negotiate a joint rate that would divide the costs of the cross-border transmissions between them, much as with "divisions" of railroad rates for shipments in which more than one railroad participates. The Commission didn't require a similar negotiation between MISO and the other RTOs that MISO abuts because no enclave or power-routing problem was created by transmission to those RTOs; there were no enclaves or highly irregular borders.

The two RTOs negotiated a joint rate designed to share the costs of some transmission upgrades with cross-border benefits—but have not negotiated a joint rate for multi-value projects. MISO argues that the Commission should have reconsidered its 2003 prohibition of export charges to PJM and permitted such charges for multi-value projects that benefit electricity customers in PJM, in light of the changes (seen in the right-hand panel of Figure 3) in the MISO-PJM border between 2003-2004 and 2013. Those changes have straightened out the border and by

doing so should have lessened the Commission's concern that "the elongated and highly irregular seam between MISO and PJM. . ..would subject a large number of transactions in the region to continued rate pancaking." *Midwest Independent Transmission System Operating, Inc.*, 137 F.E.R.C 61074, ¶ 264 (2011). No longer are any parts of Ohio in MISO, though there still are PJM enclaves. For example, a transmission from a PJM enclave in northern Illinois or southwestern Michigan to Ohio or Pennsylvania runs through MISO lines in Indiana. But with the disappearance of the MISO diagonal that we mentioned, the power-routing problem, at least, appears to have been solved, though FERC wants more data from MISO to demonstrate this.

A further concern about the continued validity of the 2003 order prohibiting tolls on transmissions between MISO and PJM is that the order was issued at a time when all of MISO's transmission projects were local and therefore provided only local benefits, so that an export charge would have shifted costs to PJM utilities that derived few or even no benefits from the projects. A related consideration behind the 2003 order was that export charges would not finance projects, but would merely operate as a toll exploiting a locational advantage. Cf. *Illinois Commerce Commission v. FERC, supra*, 576 F.3d at 473-74. The multi-value projects are new projects, not yet paid for, and since they will benefit electricity users in PJM, those users should contribute to the costs.

The MVPs also are not local. They will "support all uses of the system, including transmission on the system that is ultimately used to deliver to an external load," and

"benefit all users of the integrated transmission system, regardless of whether the ultimate point of delivery is to an internal or external load." *Midwest Independent Transmission System Operating, Inc.*, 133 F.E.R.C. 61221, ¶ 439 (2010). (By "external" read PJM or any other recipient of electricity that is outside MISO.) That is an argument for shifting some of the costs of the system to PJM utilities. The requirement of proportionality between costs and benefits requires that all beneficiaries—which the Commission has determined include all users of the MISO grid, including users in PJM—shoulder a reasonable portion of MVP costs.

MISO and PJM may eventually negotiate an allocation agreement, as they did in the pre-MVP era, but the rest of the grid is left to pay for PJM's share unless and until they do so. So far as we can tell, the Commission is being arbitrary in continuing to prohibit MISO from charging anything for exports of energy to PJM enabled by the multi-value projects while permitting it to charge for exports of energy to all the other RTOs. The Commission must determine in light of current conditions what if any limitation on export pricing to PJM by MISO is justified. This part of the Commission's decision must therefore be vacated.

*The departers.* Two former members of MISO, FirstEnergy and Duke Energy, which lie on the diagonal that had created the power-routing problem, announced their intention to quit MISO before the MVP tariff was announced. MISO wants nevertheless to allocate some MVP costs to them. FERC has ruled that allocation to

departing utilities is proper in principle, but has not yet determined which if any costs may be allocated to the two utilities in particular. That determination FERC has ruled to be outside the scope of the present proceeding, the proceeding before us. *Midwest Independent Transmission System Operating, Inc.*, 133 F.E.R.C. 61221, ¶ 472 (2010). FirstEnergy and Duke respond that they can't be made liable for any such costs because their membership contract with MISO does not provide for the imposition of such costs.

When a firm withdraws from an association owing money to it, its withdrawal does not terminate its liability; an example is an employer who withdraws from a multiemployer ERISA plan. See, e.g., *Concrete Pipe & Products v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 608-09 (1993); *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 347-48 (7th Cir. 2012). The same may be true of withdrawal from a Regional Transmission Organization. If MISO began to incur costs relating to the MVPs (including the pilot projects) before the departing members announced their departure, those utilities may be liable for some of those costs. MISO contends that they *are* liable, but the Commission has reserved the question for a separate proceeding, see *First Energy Service Co. v. Midwest Independent Transmission System Operating, Inc.*, 138 F.E.R.C. 61140, ¶ 74 (2012), as it is authorized to do. *Mobil Oil Exploration & Producing Southeast Inc. v. United Distribution Cos.*, 498 U.S. 211, 230 (1991). That proceeding is pending.

The departing members' attack on an order that amounts to a truism—that amounts to saying that if they're liable they're liable—is premature, and must therefore be dismissed for want of a final administrative decision on the matter. *California Department of Water Resources v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003); *Fourth Branch Associates v. FERC*, 253 F.3d 741, 746 (D.C. Cir. 2001).

In summary, the challenged orders are affirmed, except that the challenge by the departing MISO members is dismissed as premature and the determination regarding export pricing to PJM is remanded for further analysis by the Commission in light of the discussion of the issue in this opinion.