# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 2, 2011          Decided December 13, 2011

No. 10-1141

ALABAMA MUNICIPAL ELECTRIC AUTHORITY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CITY OF DALTON, GEORGIA, DOING BUSINESS AS DALTON
UTILITIES AND SOUTHERN COMPANY SERVICES, INC.,
INTERVENORS

———

On Petition for Review of Orders of
the Federal Energy Regulatory Commission

———

*Randolph Lee Elliott* argued the cause and filed the briefs for petitioner.

*Cynthia S. Bogorad*, *Peter J. Hopkins*, *Sharon Coleman*, and *Susan N. Kelly* were on the briefs for *amicus curiae* American Public Power Association in support of petitioner.

*Beth G. Pacella*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the briefs were *Robert H. Solomon*, Solicitor, and *Lona T. Perry*, Senior Attorney.

*Andrew W. Tunnell* argued the cause for intervenors Southern Company Services, Inc., et al. With him on the brief were *S. Chris Still*, *Kevin A. McNamee*, *Tom Blackburn*, and *James H. McGrew*.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Petitioner, Alabama Municipal Electric Authority ("AMEA"), purchases power wholesale from various sources, including Southern Company, and sells it to 11 municipally owned utilities in Alabama. To get the power to its customers, AMEA uses "unbundled" transmission service provided by one of Southern's subsidiaries, Alabama Power Company. (Southern's other public utility subsidiaries are Georgia Power Company, Gulf Power Company, and Mississippi Power Company; as referred to here, Southern always includes such subsidiaries.) When AMEA uses Southern's transmission system for such unbundled transmission, it pays the "Open Access Transmission Tariff" paid by any party receiving such service from Southern (including Southern itself). That tariff embodies the average cost of transmission service across Southern's operations.

Southern, AMEA's transmission provider, also sells power directly to retail consumers in Alabama. For transmission of these "bundled" retail sales, it uses the

Alabama component of its transmission system, which has lower unit costs than its transmission system as a whole. According to AMEA the relatively high cost of transmission service in Georgia drives Southern's systemwide average above its Alabama unit costs. In short, AMEA pays Southern a transmission rate that is higher than the implied transmission rate encompassed in the rates for Southern's own bundled retail sales in Alabama.

In a complaint filed with the Federal Energy Regulatory Commission, AMEA challenged the rate differential. It invoked FERC's "comparability standard," a policy adopted in fulfillment of provisions of the Federal Power Act requiring that all rates subject to FERC's jurisdiction be "just and reasonable" and forbidding "undue prejudice or disadvantage" in ratemaking. See 16 U.S.C. § 824d; see also 16 U.S.C. § 824e(a) (barring any "unduly discriminatory or preferential" rate). FERC has distilled its comparability standard into "a 'golden rule of pricing'—a transmission owner should charge itself on the same or comparable basis that it charges others for the same service." Inquiry Concerning the Commission's Pricing Policy for Transmission Services Provided by Public Utilities Under the Federal Power Act; Policy Statement, 59 Fed. Reg. 55,031, 55,035 (Nov. 3, 1994) ("*Transmission Policy Pricing Statement*" or "*Statement*"); see also *American Electric Power Service Corporation ("AEP")*, 67 FERC ¶ 61,168 (1994); Order No. 888, Promoting Wholesale Competition Through Open–Access Non–Discriminatory Transmission Services by Public Utilities, 61 Fed. Reg. 21,540 (May 10, 1996) ("Order No. 888"), *on reh'g,* Order No. 888–A, 62 Fed. Reg. 12,274 (Mar. 14, 1997) ("Order No. 888-A").

The comparability issue raised in AMEA's complaint had been reserved under the settlement agreement under which FERC approved Southern's transmission rates. AMEA

stresses that the settlement explicitly assigned Southern the burden of proof on the issue. In fact, the issue appears to turn entirely on the meaning of various prior FERC orders expounding the comparability concept, and we owe deference to reasonable FERC interpretations of such orders. *Natural Gas Clearinghouse v. FERC*, 108 F.3d 397, 399 (D.C. Cir. 1997).

FERC denied the relief, *Alabama Municipal Elec. Auth. v. Alabama Power Co.*, 119 FERC ¶ 61,286 (2007), and denied AMEA's request for rehearing, 131 FERC ¶ 61,101 (2010). Despite the seeming breadth of the "golden rule," we find FERC's ruling consistent with its comparability policy and deny AMEA's petition for review.

\* \* \*

AMEA treats FERC's *AEP* order and its 1994 *Transmission Pricing Policy Statement* as the two foundational documents of the comparability policy, and FERC appears to accept that view. AMEA argues that the two documents "required comparability between a transmission provider's open-access transmission service and the transmission provider's own use of its system to serve bundled retail and wholesale customers." Petitioner's Br. 37. According to AMEA the best way for Southern Company to achieve this comparability would be for it "to adopt zonal, license-plate rates for their [transmission tariff]." Petitioner's Br. 17; AMEA Complaint, Joint Appendix ("J.A.") 2-3. Under such a system, transmission service would be priced according to the power's destination: Transmission for all power delivered in Alabama, whether retail or wholesale, whether unbundled or part of bundled sale and transmission, would be charged the same rate. Under the "postage stamp" system currently employed for unbundled transmission, in

contrast, the price of unbundled transmission service is the same across Southern's transmission network; yet the rates for the transmission element of bundled retail transactions vary by location.

FERC's *AEP* decision set out to address "changing conditions in the electric utility industry, *e.g.*, the emergence of non-traditional suppliers and greater competition in bulk power markets." 67 FERC ¶ 61,168 at 61,490. When power utilities had operated simply as vertically integrated monopolies, FERC's duty to prevent "undue discrimination" had focused on "discrimination in the treatment of different customers," *id.*, presumably primarily to assure that the utilities did not improperly shift costs from favored to disfavored customers. With the development of "competition in bulk power markets," FERC believed its focus properly shifted to "discrimination in the rates and services the utility offers third parties when compared to its own use of the transmission system." *Id.* FERC decided "to refocus [its] traditional analysis of undue discrimination" and announced the rule that a transmission system "should offer third parties access on the same or comparable basis, and under the same or comparable terms and conditions, as the transmission provider's uses of its system." *Id.* In articulating its "golden rule" of pricing in its *Transmission Pricing Policy Statement*, quoted above, FERC naturally relied on the articulation in *AEP*. 59 Fed. Reg. at 55,034-35.

FERC's next logical step in responding to the development of competitive bulk power markets was its Order No. 888, requiring utilities to "unbundle" wholesale generation and transmission services, charging separate rates for each. Order No. 888, 61 Fed. Reg. at 21,558. Holding company operating subsidiaries were to "take transmission service under the same tariff rates, terms, and conditions as third-party customers that seek transmission service over the

holding company system." Order No. 888-A, 62 Fed. Reg. at 12,314.

In addressing the Commission's application of these principles to AMEA's complaint, we start with a background proposition—the line between rates subject and not subject to FERC's jurisdiction. With relatively minor qualifications (see below), FERC has not exercised authority over the transmission of bundled retail sales, whereas it does exercise jurisdiction over unbundled wholesale transmission service such as that of Southern. Order No. 888, 61 Fed. Reg. at 21,625. As a solution to the price differential from which it suffers, AMEA suggested a fallback proposal (i.e., a substitute for the license plate rate solution mentioned above) under which FERC would order Southern to unbundle its retail sales and use its transmission tariff rate for the transmission component of its (hitherto) bundled retail sales. This would in effect render jurisdictional an economic activity that has until now been non-jurisdictional.

But when the Supreme Court reviewed Order No. 888, it emphatically rejected a contention (made by Enron) that the Commission should subject the transmission used for bundled retail sales to the same sort of "open access" measures that the order imposed on wholesale transmission. *New York v. FERC*, 535 U.S. 1, 25-28 (2002). As FERC had found discrimination in the wholesale electricity market—not the retail electricity market—it was reasonable, said the Court, for FERC to limit its regulatory response to the wholesale market. *Id*. at 26-27. "Were FERC to investigate . . . and make findings concerning undue discrimination in the retail electricity market, § 206 of the FPA would require FERC to provide a remedy for that discrimination." *Id*. at 27. Justice Thomas, writing for himself and Justices Scalia and Kennedy, dissented on this point, arguing that because of the inherently interstate character of electricity transmission (except in

Alaska and Hawaii), the statute clearly gave FERC a mandate to address undue discrimination in transmission regardless of the type of transaction with which it was associated. The dissenters would have required FERC to determine whether regulating transmission in connection with bundled retail sales was necessary to eliminate undue discrimination. *Id*. at 28-42. Thus all justices took it as given that FERC was not engaged in regulating the transmission involved in bundled retail sales.

In this context, AMEA's fallback proposal that Southern be ordered to unbundle its retail sales and use its transmission tariff rate for transmission of the relevant power would as a practical matter mean an exercise of FERC jurisdiction over what FERC has decided, as all nine justices viewed the matter, not to exercise jurisdiction. And although AMEA characterizes the rate differential affecting it as undue discrimination, it does not purport to have built the sort of record FERC used to justify Order No. 888's intervention in the wholesale market, or otherwise to argue that we might be entitled to command a drastic revision of prevailing jurisdictional boundaries.

We therefore return to AMEA's proposal of "license plate" rates for Southern's jurisdictional wholesale transmission service. In fact AMEA's argument misreads FERC precedent, especially the 1994 *Transmission Pricing Policy Statement*. The express goal of the *Statement* was "to allow much greater transmission pricing flexibility." 59 Fed. Reg. at 55,031. The *Statement* noted that FERC's "traditional transmission pricing policy has permitted a public utility providing firm transmission service to charge rates . . . on a postage stamp basis (*i.e.*, not distance sensitive)." *Id*. at 55,032. In response to comments asking for flexibility to pursue other pricing options, FERC decided to allow new methods "such as zones, or line-by-line methods." *Id*. at 55,036; see *id*. at 55,039. AMEA argues that comparability

compels Southern (and perhaps any utility spanning multiple states and selling unbundled and bundled transmission service) to use a zonal pricing system. It thus takes a document opening the door to flexibility and turns it, in many circumstances, perhaps most, into one slamming the door on all but the "license plate" scheme.

AMEA also points to language from the "pro forma" transmission tariff provided in Orders No. 888 and No. 890, see Order No. 890, Preventing Undue Discrimination and Preference in Transmission Service, 72 Fed. Reg. 12,266, 12,361 (Mar. 15, 2007), which it believes supports its reading. Petitioner's Br. 38-42. For example, Section 28.2 of the pro forma transmission tariff in Order No. 888 provides that "the Transmission Provider shall include the Network Customer's [e.g., AMEA's] Network Load in its Transmission System planning and shall . . . endeavor to construct and place into service sufficient transmission capacity to deliver the Network Customer's Network Resources to serve its Network Load on a basis comparable to the Transmission Provider's delivery of its own generating and purchased resources to its Native Load Customers [e.g., Alabama Power's retail customers]." 61 Fed. Reg. at 21,718.

FERC counters that these passages concern only comparability in non-rate terms and conditions of service. Indeed, while the passage (and similar ones) mention a variety of terms of service, rate provisions are not among them. We have held that these exercises of power over non-rate conditions are not inconsistent with the Commission's position in Order No. 888 (i.e., its general non-exercise of jurisdiction over bundled retail service). *Entergy Services v. FERC*, 375 F.3d 1204, 1210 (D.C. Cir. 2004). At oral argument we inquired of FERC counsel just why the Commission intervened as to non-rate matters (but not rates), and she explained that FERC intervenes to maintain

"transmission availability." For instance, in the order reviewed in *Entergy*, the Commission restricted a transmission provider's reservation of capacity for its own bundled retail uses because that reservation "would have a direct impact on the capacity available to other customers taking firm transmission service." Oral Argument Tr. 17. We need not evaluate the strength of the distinction, as AMEA rests its case on what the *Statement* and Order No. 888 say, not on a challenge to the logic of what they say.

But what of the "'golden rule of pricing'—a transmission owner should charge itself on the same or comparable basis that it charges others for the same service"? *Statement*, 59 Fed. Reg. at 55,035. Under FERC's view, the "golden rule," as articulated in FERC orders, does not require comparable pricing as between unbundled and bundled transmission service. Order on Rehearing, 131 FERC ¶ 61,101 at PP 9-10. In light of the jurisdictional versus non-jurisdictional divide, that understanding seems reasonable, if not altogether inevitable. AMEA points to nothing in the *AEP* order, the *Statement*, or elsewhere, contradicting the view that jurisdictional unbundled transmission service is not "the same service" as the transmission component of non-jurisdictional bundled retail service.

AMEA several times cites the Supreme Court's decision in *FPC v. Conway*, 426 U.S. 271 (1976), in which the Court held that FERC could consider rates not subject to FERC jurisdiction in order to determine whether jurisdictional rates were unduly discriminatory. Later cases by this court elaborated the "price squeeze" doctrine: a utility's behavior may be unduly discriminatory if it sells both retail and wholesale power and attempts to "squeeze" its retail competitors out of the market by selling wholesale power at a high price. See *Ellwood City v. FERC*, 731 F.2d 959, 968 (D.C. Cir. 1984). But AMEA did not raise a price squeeze

claim in its complaint to the Commission.  AMEA Complaint, J.A. 1-35; see also 18 C.F.R. § 2.17 (listing the "elements of the prima facie" price squeeze case that a complainant must make out).  We therefore do not address the possibility that Southern Company's transmission pricing constitutes a "price squeeze."  Our inquiry is limited to the issue reserved in the settlement—whether Southern's pricing violates FERC's comparability policy—and, giving FERC the appropriate level of deference on its interpretation of its own orders, we conclude that it does not.

* * *

The petition for review is therefore

*Denied.*