# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-1553

_____

Nebraska Public Power District

*Petitioner*

v.

Federal Energy Regulatory Commission

*Respondent*

GridLiance High Plains LLC; Southwest Power Pool; Tri-State Generation & Transmission Assn.

*Intervenor*s

------------------------------

Edison Electric Institute

*Amicus on Behalf of Petitioner*
_____

Petition for Review of an Order of the
Federal Energy Regulatory Commission
_____

Submitted: January 15, 2020
Filed: April 30, 2020
_____

Before SMITH, Chief Judge, LOKEN and GRUENDER, Circuit Judges.
_____

SMITH, Chief Judge.

Southwest Power Pool (SPP) is a Regional Transmission Organization (RTO) authorized by the Federal Energy Regulatory Commission (FERC) to provide electric transmission services across a multi-state region. Under SPP's license-plate rate design,[1] SPP is divided into different zones, and customers in each zone pay rates based on the cost of transmission facilities in that zone.

In 2018, FERC approved SPP's placement of Tri-State Generation & Transmission Association ("Tri-State") into Zone 17. Nebraska Public Power District (NPPD), as a member of Zone 17, challenges FERC's decision, arguing that FERC erred in concluding that the proposed placement was just and reasonable. Specifically, NPPD alleges that FERC failed to conclude, based on substantial evidence, that the benefits that NPPD and other Zone 17 facilities receive from Tri-State's transmission facilities are at least roughly commensurate with the costs allocated to Zone 17 as a result of Tri-State's placement in Zone 17. We deny the petition and affirm FERC's decision.

I. *Background*
A. *Statutory and Regulatory Framework*

This case arises out of Section 205 of the Federal Power Act (FPA). Under Section 205 of the FPA, "[a]ll rates and charges made, demanded, or received by any

_____

[1]In a license-plate rate design, transmission service in the RTO is "priced according to the power's destination." *Ala. Mun. Elec. Auth. v. FERC*, 662 F.3d 571, 573–74 (D.C. Cir. 2011). Explained another way, every transmission owner in that particular area, or zone, is charged the same rate. *Id.* at 574.

public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of [FERC], . . . shall be just and reasonable." 16 U.S.C. § 824d(a). "Section 205(d) provides that unless [FERC] otherwise orders, 'no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to [FERC] and to the public.'" *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 949 (D.C. Cir. 2016) (quoting *id.* § 824d(d)).

To eliminate free market barriers in wholesale electricity and to reduce technical inefficiency, FERC promulgated regulations to encourage transmission providers to establish RTOs. *See Morgan Stanley Capital Grp. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 536–37 (2008); *see also* Order No. 2000, 65 Fed. Reg. 810, 810–12 (Jan. 6, 2000) (codified at 18 C.F.R. § 35.34). RTOs are entities, independent of any market participant, that exercise operational control over transmission facilities owned by the RTO's members. *Morgan Stanley*, 554 U.S. at 536. To that end, FERC encouraged Independent System Operators (ISOs), "not-for-profit entities that operate transmission facilities in a nondiscriminatory manner," to manage the RTOs. *Id.* at 536–37.

In 2004, FERC authorized SPP to form a RTO to provide electric transmission services across a multi-state region using the transmission facilities of 15 different utilities placed in 15 different zones. Under SPP's license-plate (or zonal) rate design, customers located in each zone pay rates based on the cost of the transmission facilities located in that zone. Since 2004, SPP has expanded its geographical footprint by establishing new rate zones for larger transmission providers and by placing smaller transmission providers into existing zones. When a new transmission owner (TO) joins SPP and is placed into an existing zone, the cost of that new TO's transmission facilities is added to the rates charged by SPP for transmission in that zone. Therefore, adding a new TO affects the rate for existing customers in that zone.

B. *Existing Relationship of NPPD and Tri-State*

Tri-State's and NPPD's history as electric transmission providers informs Tri-State's placement into Zone 17. NPPD and Tri-State have a relationship that dates back decades before Tri-State joined Zone 17. In 1975, NPPD and Tri-State entered into a Memorandum of Agreement to establish principles for the joint operation and planning of their transmission facilities in Nebraska. Later, on June 8, 1984, the two transmission providers entered into the Western Nebraska Joint Transmission Agreement ("Agreement") to "establish a joint transmission system for the Parties' mutual benefit and joint use." Pet'r's App. at 62.

The Agreement explained that "portions of Tri-State's electric power transmission facilities in Western Nebraska are interconnected with NPPD's electric power transmission system and are operated in synchronism with it." *Id.* at 61. Further, the Agreement provided that the facilities should use the Single-Entity Concept, which meant that the providers should operate the systems as if they were owned by one provider. And, the Agreement gave NPPD and Tri-State the right to use each other's transmission systems to serve their own customers.

The Agreement also had a Costs and Benefits section, which provided that "[e]ach Party shall receive benefits commensurate with its actual costs. Such benefits shall be in the form of transmission use of [the Agreement] and in the form of Annual Equalization Payments from one Party to the other." *Id.* at 66. The Annual Equalization Payment covered interest, an estimated amount for operations and maintenance expense, and administrative and general costs. The Agreement measured the providers' use of the transmission facilities under the annual coincident peak method, which measured each provider's use at the time the combined use of the facilities was at its peak for the entire year. Under this method, Tri-State paid NPPD an average of $1 million each year.

However, the payments could vary depending upon the peak method employed. For example, using a month coincident peak method, Tri-State averages 41 percent of the use of the facilities and NPPD averages 59 percent. This would result in a benefit of $550,000 a year to NPPD. SPP uses the month coincident peak method to establish transmission rates.

After over 40 years of joint use, the transmission facilities of Tri-State and NPPD are now highly integrated. They share at least five points of interconnection. And, NPPD would lack a transmission path to some of its customers if it could not use Tri-State's facilities. NPPD thus relies on its ability to use Tri-State's facilities to serve its customers.

C. *Placement of Tri-State into Zone 17*

In 2009, NPPD joined SPP, placing Tri-State's and NPPD's jointly operated facilities under the functional control of SPP in Zone 17. Around this time, three other entities (Western Area Power Administration–Upper Great Plains Region, Basin Electric Power Cooperative, and Heartland Consumers Power District) also joined SPP. The expansion, in effect, surrounded Tri-State's facilities with facilities controlled by SPP. In addition to the geographical convenience, Tri-State also saw how joining SPP could potentially lower costs to its customers and enable it to terminate the Agreement with NPPD.

Tri-State then decided to join SPP. On October 30, 2015, SPP revised its Open Access Transmission Tariff[2] to incorporate Tri-State's formula rate and make other modifications to accommodate Tri-State as a TO under the SPP Tariff. In the filing,

---

[2]FERC "governs the rates, terms and conditions of SPP through its Open Access Transmission Tariff" and any changes in the Open Access Transmission Tariff "must be approved/accepted by FERC before SPP can operate under the requested changes." *Governance*, SPP.org, https://www.spp.org/governance/ (last visited Apr. 24, 2020).

SPP proposed to place Tri-State's transmission facilities and the associated Annual Transmission Revenue Requirement (ATRR)[3] into Zone 17. Given Tri-State's history with NPPD, it was no surprise that NPPD was the dominant TO in Zone 17.

SPP followed its established criteria for determining zonal placement. These criteria include:

> (1) whether the new TO's ATRR is less than the ATRR of an existing pricing zone with the smallest ATRR; (2) the extent to which a new TO's facilities are embedded within a pre-existing zone; (3) the extent to which a new TO's facilities are integrated with (including number of interconnections) an existing TO's facilities; and, (4) the extent to which the new TO's facilities substantively increase the SPP footprint.

*Sw. Power Pool, Inc.*, 158 FERC ¶ 63,004, at P 74 (2017) (Initial Decision). As applied to Tri-State, SPP explained that:

> (1) Tri-State's ATRR is less than the smallest ATRR of an existing SPP TO in a single owner zone; (2) Tri-State has more direct interconnections with the NPPD system than with any other SPP TO, and thus is more integrated with NPPD than any other SPP TO; (3) NPPD and Tri-State have over a 40-year history of coordination regarding the planning and operation of their two systems, due to long-standing contractual relationships; and, (4) the inclusion of the Tri-State facilities only minimally increases the size and scope of the SPP footprint.

*Id.* at P 75. After SPP filed its proposal to place Tri-State in Zone 17 with FERC, NPPD protested the filing. In December 2015, FERC accepted the filing and set a hearing on the issue of whether SPP's proposal was just and reasonable.

---

[3]The ATRR is the amount of revenue a transmission owner must recover annually to cover the costs associated with its transmission facilities.

### D. *Cost Impact Testimony*

In its opposition, NPPD emphasized the cost impact of adding Tri-State to Zone 17. NPPD asserted that a cost shift occurs when a portion of a new TO's ATRR associated with its transmission facilities is not paid by that new TO's own load. NPPD calculated that Tri-State's ATRR would be $7.2 million and explained that the ATRR was 11.2 percent of the combined total ATRR in Zone 17 but that Tri-State's load was only 4.4 percent of the total load. Therefore, NPPD concluded that adding this ATRR to Zone 17 would increase the annual per megawatt (MW) cost of serving the Zone 17 load by 8 percent. Further, NPPD stated, that by joining Zone 17, Tri-State would reduce its responsibility for paying its own costs by 60 percent by shifting $4.3 million of its $7.2 million ATRR to other Zone 17 customers.

Tri-State disputed NPPD's calculations. Specifically, Tri-State testified that instead of NPPD's calculated $4.3 million cost shift, the actual cost shift to NPPD would be between $1.2 million to $2 million per year. Tri-State adjusted NPPD's estimate to (1) exclude revenue associated with the Agreement, (2) add costs that NPPD would incur if Tri-State were in another zone, and (3) adjust based on measurable future changes. First, Tri-State noted that its termination of the Agreement will decrease its ATRR by $1 million when the Agreement ends in 2020. Second, the relationship between the two is not reciprocal. Tri-State explained that while 21.5 MW of NPPD's load is connected to Tri-State's facilities, only 8.2 MW of Tri-State's load is connected to NPPD's facilities. If Tri-State were not in Zone 17, Tri-State estimated that NPPD would have to pay around $1.2 million in a zone other than Zone 17. In contrast, if Tri-State remained in Zone 17, NPPD would benefit about $200,000. Third, SPP's data showed that Tri-State would pay future regional costs of around $700,000 that would otherwise fall onto NPPD. In total, Tri-State estimated a 1.8 percent increase in cost shift to NPPD.

NPPD responded to Tri-State's calculation by stating that the cost shift should be based on the effective date of Tri-State's membership in SPP and not account for

future elements. Further, NPPD contended that cost impacts that would occur if Tri-State were in another zone should not be taken into account. Finally, NPPD stated that Tri-State would be a better fit in Zone 19 because there would only be a .2 percent increase in cost shift in Zone 19.

### E. *FERC Proceedings*

Following the hearing, the administrative law judge (ALJ) determined that SPP's proposal to place Tri-State into Zone 17 was just and reasonable. In a 140-page opinion, the ALJ discussed, in considerable detail, the parties' testimonies and SPP's four zonal placement criteria. The ALJ placed great emphasis on the 40-year history of NPPD and Tri-State, discussed the integration of the two entities's facilities, pointed out that neither had a physical path to its loads without using the transmission facilities of the other, and pointed out that the two used a Single-Entity Concept.

Concerning the cost shift, the ALJ first noted that NPPD did not argue that SPP's current license-plate rate structure was inappropriate and that FERC had already approved nine multi-TO zones in SPP despite cost shifts. In addition, the ALJ pointed out that the narrow issue of zonal placement in the present case differed from RTO-wide rate design. The ALJ then discussed how the integrated nature of Tri-State and NPPD lessened cost-causation concerns because Zone 17 benefitted and would continue to benefit from Tri-State's facilities in Zone 17. The ALJ also determined that year-to-year adjustments affected cost-causation principles. The ALJ concluded:

> Based on the findings that the cost shift at issue here is not *per se* unjust and unreasonable, does not violate cost causation principles, and its impact on Zone 17 customers will be reduced over the next five to seven years, I find that the cost shift at issue here does not render Tri-State's proposed placement into Zone 17 unjust and unreasonable.

*Sw. Power Pool*, 158 FERC ¶ 63,004, at P 360. Finally, the ALJ rejected NPPD's proposal to place Tri-State into Zone 19 because the interconnections in Zone 17

-8-

outweighed the interconnections in Zone 19 and there was no evidence to suggest that Tri-State could reliably serve its load without causing a cost shift in Zone 19.

On March 26, 2017, NPPD filed exceptions to the ALJ's decision, arguing that SPP's proposed placement of Tri-State's facilities into Zone 17 was unjust and unreasonable. However, in an 108-page opinion, FERC agreed with the ALJ. When considering SPP's criteria, FERC explained that Tri-State's geographical scope filled in gaps instead of expanding SPP's footprint, noted the substantial evidence of Tri-State's integration with existing Zone 17 facilities, and pointed out that NPPD and Tri-State treated their systems as a joint system owned by a single entity.

Considering the cost shift, FERC explained that the Agreement showed both parties would benefit from the joint use of the facilities and access to each other's facilities. Further, FERC rejected NPPD's argument that Tri-State was the beneficiary of the Agreement because a different methodology calculated NPPD being the net beneficiary. And, FERC stated that NPPD acknowledged that it benefitted from the joint system. Finally, FERC considered the Seventh Circuit's case of *Illinois Commerce Commission v. FERC* and concluded that the record provided "'an articulable and plausible reason to believe that the benefits are at least roughly commensurate' with the costs that are being allocated to Zone 17 customers." *Sw. Power Pool Inc.*, 163 FERC ¶ 61,109, at P 207 (May 17, 2018) (quoting *Illinois Commerce Comm'n v. FERC* (*Illinois Commerce I*), 576 F.3d 470, 477 (7th Cir. 2009)). FERC further stated:

> Although there may not be a specific quantification of the benefits that NPPD received and will continue to receive from the Tri-State transmission facilities, this is unsurprising because the entities treated their transmission facilities under the . . . Agreement as if they were a single system owned by a single entity. The . . . Agreement detailed the benefits that the parties would realize, and the parties continued that

agreement for over 30 years, indicating that they were in fact benefitting from the agreement.

*Id.* FERC then rejected NPPD's arguments that Tri-State was more connected with Zone 19. It stated that the record showed that Tri-State's placement in Zone 17 was just and reasonable, and FERC did not need to consider arguments about alternative placements. Therefore, FERC affirmed the ALJ's decision.

On June 15, 2018, NPPD filed a request for rehearing, but FERC denied the request. Specifically, FERC noted that it continued to find "that the benefits that NPPD and its customers receive from Tri-State's transmission facilities are at least roughly commensurate with the costs allocated to NPPD as a result of the placement of those facilities in Zone 17." *Sw. Power Pool, Inc.*, 166 FERC ¶ 61,019, at P 21 (Jan. 17, 2019). FERC further emphasized that cost allocation is not an exact science and requires fact-intensive judgments to assure that rates reflect the costs caused by customers. *Id.* at P 22 (citing *Colo. Interstate Gas Co. v. FPC*, 324 U.S. 581, 589 (1945); *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1369 (D.C. Cir. 2004)).

Finally, FERC rejected NPPD's argument that Tri-State should have been placed in Zone 19. FERC further stated that because its role is to decide whether a proposal is just and reasonable, it is not required to determine whether other alternatives might be superior. NPPD seeks review of FERC's decision.

## II. *Discussion*

Section 205's requirement that rates be just and reasonable does not have a "precise judicial definition, and we afford great deference to [FERC] in its rate decisions." *Morgan Stanley*, 554 U.S. at 532. We review FERC's decision under an arbitrary and capricious standard. *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). "[W]e are required to accept as conclusive the 'findings of [FERC] as to

facts, if supported by substantial evidence.'" *Minnesota v. FERC*, 734 F.2d 1286, 1288 (8th Cir. 1984) (quoting 16 U.S.C. § 825*l*(b)). In addition, we must uphold the decision "if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Elec. Power*, 136 S. Ct. at 782 (cleaned up).

NPPD argues that substantial evidence does not support FERC's finding that Tri-State's placement into Zone 17 was just and reasonable. Specifically, NPPD argues (1) that FERC's order approving Tri-State's placement in Zone 17 does not comport with cost-causation principles and (2) that FERC erred by refusing to consider placement in Zone 19 as an alternative to placement in Zone 17.

## A. *Cost-Causation Principles*

At base, the FPA requires that rates be just and reasonable. 16 U.S.C. § 824d(a). But, beyond that, "FERC and the courts have added flesh to these bare statutory bones, establishing what has become known in Commission parlance as the 'cost-causation' principle." *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992). FERC acknowledges that it must have "an articulable and plausible reason to believe that the benefits" of placing Tri-State in Zone 17 "are at least roughly commensurate with" the costs allocated to NPPD and its customers. *Illinois Commerce I*, 576 F.3d at 477. Consequently, courts must "evaluate compliance with this unremarkable principle by comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party." *Midwest ISO*, 373 F.3d at 1368. But, that does not mean that FERC must "allocate costs with exacting precision." *Id.* at 1369. Further, we should not grant NPPD's petition unless we find that the cost-allocation determination of FERC is arbitrary and capricious "in light of the burdens imposed or benefits received." *Id.*

NPPD argues that FERC acted arbitrarily and capriciously because its decision ignores the large imbalance between the minimal benefits and major costs of placing

-11-

Tri-State into Zone 17. In support of its argument, NPPD mainly focuses on the Seventh Circuit's decisions in *Illinois Commerce I*; *Illinois Commerce Commission v. FERC* (*Illinois Commerce II*), 756 F.3d 556 (7th Cir. 2014); and *Illinois Commerce Commission v. FERC* (*Illinois Commerce III*), 721 F.3d 764 (7th Cir. 2013).

In *Illinois Commerce I*, PJM Interconnection, a RTO, proposed to change the pricing method for new transmission facilities with a capacity of 500 kilovolts (kV) from being calculated on the basis of the benefits each utility received from the new facilities to a pro rata contribution between all transmission facilities no matter the benefits. 576 F.3d at 474. The new pricing method created a large disparity between the eastern and western regions of the RTO. *Id.* at 475. Although the eastern facilities often used 500 kV facilities, the western facilities almost never did and there was no plan to build any in the foreseeable future. *Id.* Because of this, the new pricing method would require western facilities to contribute an estimated $480 million to the cost of facilities that they would not have paid any money for under the original pricing method. *Id.* at 474–76. FERC authorized the pricing method, but the Seventh Circuit remanded for further proceedings, explaining that "FERC is not authorized to approve a pricing scheme that requires a group of utilities to pay for facilities from which its members derive no benefits, or benefits that are trivial in relation to the costs sought to be shifted to its members." *Id.* at 476–78. FERC only listed benefits such as avoiding litigation and benefitting the network as a whole, but "a claim of generalized system benefits is not enough." *Id.* at 475–76 (internal quotation omitted).

In *Illinois Commerce II*, the Seventh Circuit again considered the same pricing method after FERC re-approved the pro rata cost allocation without any attempt at empirical justification. 756 F.3d at 561. Because of this, the Seventh Circuit remanded to FERC. *Id.* at 565. It explained that FERC "*assumes*—it does not demonstrate—that the benefits of the eastern 500–kV lines are proportionate to the total electric-power output of each utility, no matter how remote the utility is from the eastern projects that the utility is to be made to contribute to the costs of." *Id.* at 561.

The Seventh Circuit directed FERC to attempt to quantify the benefits because "the lines at issue [we]re all located in PJM's eastern region, primarily benefit[ted] that region, and should not [have] be[en] allowed to shift a grossly disproportionate share of their costs to western utilities on which the eastern projects will confer only future, speculative, and limited benefits." *Id.* at 565.

We first note that the scenario in *Illinois Commerce I* and *Illinois II* differs substantially from this case. That case involved an RTO-wide rate change. Here, we address only the narrow issue of whether Tri-State's placement in one particular zone was reasonable with respect to those already in that zone. There, the rate change involved a change for every transmission provider member in the RTO, no matter the location. *Illinois Commerce I*, 576 F.3d at 474. In contrast, the present case revolves around SPP's placement of Tri-State into a specific zone with NPPD. Because of the very nature of zones, NPPD will receive more benefits from being in close proximity to Tri-State than the western facilities of *Illinois Commerce I* would have received from distant facilities.

Despite those differences, FERC's decision satisfies the cost-causation principles set out in *Illinois Commerce I*. To satisfy cost-causation principles, there must be "an articulable and plausible reason to believe that the benefits are at least roughly commensurate with" the costs of placing Tri-State into Zone 17. *Id.* at 477. Further, FERC should examine "how much use or how much benefit" NPPD would get from Tri-State's placement in Zone 17. *Illinois Commerce II*, 756 F.3d at 562.

NPPD emphasizes that neither FERC nor Tri-State attempted to numerically *quantify* the benefits of placing Tri-State into Zone 17. However, *Illinois Commerce I* does not support the proposition that FERC must articulate a precise numerical value of benefits. The Seventh Circuit did "not suggest that [FERC] has to calculate benefits to the last penny, or for that matter to the last million or ten million or perhaps hundred million dollars." 576 F.3d at 477. Rather, FERC must articulate

-13-

more benefits than the "no benefits" or trivial benefits in *Illinois Commerce I*. *See id.* at 476–77.

FERC expressed several benefits of placing Tri-State into Zone 17 with NPPD. Given the 40-year history between NPPD and Tri-State, it is unsurprising that the two are extremely connected. Taking into account SPP's criteria, FERC continually articulated the benefits to NPPD of placing Tri-State in Zone 17: NPPD and Tri-State's facilities were already integrated, NPPD used Tri-State's facilities to serve its customers, the two entered into an Agreement to operate as a single entity, and both could not reach their customers without using the other's facilities. Further, the Agreement between Tri-State and NPPD called for mutual benefit and joint use.

To be sure, the benefits cannot be calculated with precision. NPPD and Tri-State disagree about the costs of placing Tri-State into Zone 17. NPPD estimates an immediate shift of $4.3 million and $3.5 million in the future. In contrast, Tri-State reduces the cost to around $2 million given the cancellation of the Agreement, costs NPPD would incur if Tri-State were in another zone, and future measurable changes. But, it is certain that "[t]o the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred." *Id.* at 476. Because NPPD has greatly benefitted from Tri-State's facilities, it is likely that some of the costs have been caused by NPPD.

Given these disputed costs and benefits, this case more closely resembles *Illinois Commerce III*. There, Midwest Independent Transmission System Operator, Inc. (MISO), a TRO, sought approval to impose a tariff on its members to fund construction of new power lines for electricity generated by wind farms. *Illinois Commerce III*, 721 F.3d at 771. MISO explained that, as a whole system, the RTO might benefit several hundred million dollars from the switch to wind energy, but it was impossible to allocate the savings to each member of MISO. *Id.* at 774. The

Seventh Circuit noted that although some benefits could not be calculated in advance, there was no doubt that there would be real benefits to the members. *Id.* at 775.

As the Seventh Circuit stated, FERC's attempt to match costs and benefits might have been crude, but "if crude is all that is possible, it will have to suffice." *Id.* Similar to *Illinois Commerce III*, FERC could not calculate all of the benefits because of the difficulty in assigning value to benefits such as interconnections and the ability to service customers. But, FERC gave "articulable and plausible reason[s] to believe that the benefits are at least roughly commensurate with" the costs. *Id.* (quoting *Illinois Commerce I*, 576 F.3d at 477).

In an effort to account for the listed benefits, NPPD argues that the Agreement already accounted for all of the benefits between NPPD and Tri-State. Specifically, NPPD argues that the Annual Equalization Payment in the Agreement reveals that Tri-State is the net beneficiary of the Agreement in the amount of $1 million. In addition, NPPD acknowledges that under a month coincident peak method, it benefits $550,000 per year. However, NPPD argues that this still shows that the benefits are not "roughly commensurate" to the costs. NPPD attempts to expand the Annual Equalization Payment to include all benefits, but this overstates the purposes of the payment. The Agreement states that benefits consist of joint transmission use in addition to the Annual Equalization Payment. The equalization payment is money. The joint transmission use is a valuable but non-monetary benefit. The Agreement does not attempt to quantify the benefits from joint use. Instead, one party to the Agreement pays the other if the party's usage of the facilities exceeds its share of the expenses. This is so because "the benefits each Party receives from using [the Agreement] will not equal its costs to own, operate, and maintain its facilities." Pet'r's App. at 67.

Further, NPPD's argument that the Agreement shows it is a negative beneficiary fails because NPPD benefits from the joint use and operation established

in the Agreement. For example, in *Midwest ISO*, MISO owners challenged a cost adder expense to recover administrative costs for running the ISO, stating that they would pay 60 to 70 percent of the costs for only 5 percent of the benefits. 373 F.3d at 1370. However, the D.C. Circuit explained that the low benefit number resulted from the "intertwined" nature of the expenses "and the corresponding difficulty of unbundling them." *Id.* at 1371. The court compared MISO to the federal court system and the MISO owners' complaint to taxpayers complaining about having to pay to fund the court system. *Id.* In particular, it was similar to taxpayers arguing "that if they are not a litigant, they should not be made to pay for any of the costs of *having* a court system." *Id.* Similarly, because MISO owners obviously received benefits for participating in the ISO, "FERC correctly determined that they should share the cost of *having* an ISO." *Id.*

As this example shows, it is disingenuous for NPPD to argue that it gains no benefits nor incurs any costs from its relationship with Tri-State when it has chosen to maintain a relationship with Tri-State for over 40 years. As it did in *Midwest ISO*, FERC, in this case, correctly determined that the costs associated with the benefits were comparable given the relationship between the two parties and the intertwined nature of NPPD and Tri-State's facilities. Even if there is a net increase in costs, such costs "can be 'just and reasonable' if the costs are warranted." *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (per curiam) (quoting 16 U.S.C. § 824d(e)). When FERC explains "important non-cost reasons" for approving a proposal, "[i]t does not have to find net savings." *Id.* Because FERC stated plausible and articulable reasons for why the costs and benefits were comparable in this case, we cannot say that its cost-causation analysis was arbitrary and capricious.

### B. *Placement in Zone 19*

NPPD argues that FERC acted in an arbitrary and capricious manner because it did not consider the effects of placing Tri-State in Zone 19. Specifically, NPPD

argues that had FERC considered Zone 19, it would have seen that Tri-State's placement in Zone 19 would have resulted in minimal cost shift.

However, FERC did not err by failing to consider evidence of Zone 19. "FERC has interpreted its authority to review rates under [Section 205] as limited to an inquiry into whether the rates proposed by a utility are reasonable—and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs." *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984). In *Cities of Bethany*, the D.C. Circuit explained that the standard in rate decisions is "not whether [one] method is more appropriate than [another] method, but rather whether the [proposed] method is reasonable and adequate." *Id.* (internal quotation omitted). In addition, courts have made it clear that FERC "restricts itself to evaluating the confined proposal." *Advanced Energy*, 860 F.3d at 662. Therefore, FERC "need only find the *proposed* rates to be just and reasonable." *City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984) (Scalia, J.).

The law does not require FERC to consider NPPD's alternative suggestion of Tri-State's placement in Zone 19 because its role was simply to decide whether SPP's proposed placement of Tri-State was just and reasonable. Here, FERC "examine[d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Therefore, FERC did not act arbitrarily and capriciously in deciding that Tri-State's placement into Zone 17 was just and reasonable.[4]

_____

[4]NPPD also argues that FERC erred because it ignored SPP's new criterion established after FERC's decision: the nature of transmission service used to serve the load of a new TO prior to its expected date of transfer to SPP. NPPD states that this would have shown that Tri-State belonged in Zone 19. However, as explained in this section, FERC did not have to consider NPPD's alternative evidence of the benefits of placing Tri-State into Zone 19. *See Advanced Energy*, 860 F.3d at 662.

### III. *Conclusion*

Accordingly, we deny NPPD's petition for review.

_____