# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 5, 2024          Decided July 11, 2025

No. 23-1133

PARAGOULD LIGHT & WATER COMMISSION, D/B/A
PARAGOULD LIGHT, WATER & CABLE – PLWC, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CITY UTILITIES OF SPRINGFIELD, MISSOURI AND SOUTHWEST
POWER POOL, INC.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Matthew A. Fitzgerald* argued the cause for petitioners. With him on the briefs were *Noel H. Symons*, *Carrie Mobley*, *Robert A. Weishaar, Jr.*, *Kenneth R. Stark*, *Daniel E. Frank*, *Allison E. S. Salvia*, *Patrick Smith*, *Timothy T. Mastrogiacomo*, and *Shaun M. Boedicker*.

*J. Houston Shaner*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on

the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Elizabeth P. Trinkle* argued the cause for intervenor for respondent Southwest Power Pool, Inc. With her on the brief was *Matthew J. Binette*.

Before: PILLARD, WALKER and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: The Federal Energy Regulatory Commission encourages transmission facilities to band together into regional zones for purposes of allocating the costs of building, maintaining, and operating the power lines that carry electricity from producers to users. Those zones are administered by system operators, like the regional Southwest Power Pool in this case, that work to improve efficiency and reliability. To achieve those goals, a zone spreads the costs of all the transmission facilities in the zone across all the zone's customers — even if a particular customer won't draw power across a particular transmission facility.

None of that is new. But what happens when an existing zone wants to expand? That's what happened here — and it's likely to happen frequently in the future. An existing zone wants to bring facilities outside the zone into the zone. And it wants to spread the costs of those newly integrated facilities across the zone's customer base.

Here, some of the existing zone's customers doubted the benefits of the new integration, and they opposed the cost increase that would come with it. So they took their objections to FERC. FERC overruled their objections, approved the

integration, and imposed a new tariff, or price formula, for the zone.

FERC's decision was reasonable. FERC may analyze costs and benefits at the zonal level rather than the customer level, and FERC reasonably determined that all the zone's customers will enjoy benefits. Because of those zone-wide benefits, it was reasonable for FERC to spread the integration's costs to all the zone's customers.

We deny the petition for review.

## I. Background

### A. The Power Grid

In the early 1990s, many phones had cords, the Chicago Bulls were NBA champions, and vertically integrated monopolies controlled power generation, transmission, and distribution in a system of localized supremacy that wasn't conducive to competition or grid efficiency.

But times changed. Smart phones largely replaced land lines. The Bulls' dominance declined. And FERC issued an ultimatum to electric monopolies: Divest or allow other utilities to use your transmission facilities on an "open-access non-discriminatory" basis. *See* Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, 61 Fed. Reg. 21540, 21541, 21552 (May 10, 1996) (Order No. 888); *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363-65 (D.C. Cir. 2004).

FERC unbundled transmission from generation and distribution to unleash competition. *See Morgan Stanley Capital Group Inc. v. Public Utility District No. 1*, 554 U.S.

527, 535-37 (2008). And to improve grid efficiency and reliability, FERC promoted regional transmission organizations, which coordinate the operations of individual member utilities within each grid. *See* Regional Transmission Organizations, 65 Fed. Reg. 810, 811, 831, 834 (Jan. 6, 2000) (Order No. 2000); *see also* Order No. 888, 61 Fed. Reg. at 21552, 21666-67; *Midwest ISO*, 373 F.3d at 1363-65. Ideally, these regional transmission organizations would be run by independent system operators, which would provide access and power "to all eligible users in a non-discriminatory manner." *Midwest ISO*, 373 F.3d at 1364 (quoting Order No. 888, 61 Fed. Reg. at 21596).

One such independent system operator and regional transmission organization is Southwest Power Pool. It operates in fourteen states and uses a zonal-pricing rate system for its nineteen different price zones. Under this system, "customers located in each zone pay rates based on the cost of the transmission facilities located in that zone." *Nebraska Public Power District v. FERC*, 957 F.3d 932, 935 (8th Cir. 2020).

## B. The Nixa Assets

The City of Nixa lies in the southwest corner of Missouri. It's home to approximately ten miles of transmission lines and substations — the "Nixa Assets" — that primarily serve local residents.

At first, Nixa powered the Assets by purchasing its power from a federal power administration. But when that purchase agreement expired in 2017, Nixa began purchasing power

through Southwest Power Pool — though it retained operational control over the Nixa Assets.[1]

Southwest Power Pool added Nixa's load to Southwest Power Pool Zone 10, consistent with the existing tariff. So, for a time, Nixa purchased its load through Southwest Power Pool at rates reflecting the Zone 10 transmission costs — thus paying a proportional cost of the expenses for the Zone 10 transmission facilities already controlled by Southwest Power Pool while *also* bearing the operational costs of its own transmission assets.

Later in 2017, Nixa agreed to sell the Nixa Assets to a private entity, GridLiance High Plains LLC.[2] GridLiance and Southwest Power Pool agreed to incorporate the Nixa Assets into Southwest Power Pool's integrated grid, with GridLiance surrendering operational control of the facilities to Southwest Power Pool.

## C. This Case

Anticipating this integration, Southwest Power Pool filed with FERC a tariff revision that proposed incorporating the Nixa Assets into its Zone 10 infrastructure. The revised tariff

---

[1] The legacy contracts between many municipal utilities and the federal power administration which they relied upon for transmission — the Southwestern Power Administration — required these utilities to switch to Southwest Power Pool transmission service at the end of the contract. Nixa is one of the first municipal utilities to undergo this process.

[2] FERC approved this sale the following year. *See South Central MCN LLC*, 162 FERC ¶ 61214, at p. 62143 (2018). Note: GridLiance previously operated under a different identity — South Central MCN LLC.

added the costs of the Nixa Assets to the overall transmission costs that Southwest Power Pool spreads across all Zone 10 customers.

Several parties, including nearby cities, objected to this proposed tariff revision. *See* 162 FERC ¶ 61215, at pp. 62155-56 (2018). They protested that incorporating the transmission costs of the Nixa Assets into the Zone 10 zonal rate would result in an unjustified "cost shift" — a violation of what's known as the 'cost-causation principle.' *See* 174 FERC ¶ 61116, at pp. 61438-40 (2021). They claimed the tariff revision forced them to pay the costs associated with the Nixa Assets even though they, the non-Nixa cities and utilities, wouldn't receive any benefits from the incorporation of the Nixa Assets. *See* 162 FERC ¶ 61215, at p. 62155.

FERC initially ruled that it could not accept Southwest Power Pool's proposed tariff because there was "insufficient evidence in the record for [FERC] to make a determination on whether and the extent to which there are cost shifts involved in the placement of the Nixa Assets into Zone 10 or benefits that may accrue that would justify any such cost shifts." 174 FERC ¶ 61116, at p. 61445. It therefore remanded the case for another hearing to resolve those questions. *See id.* at p. 61446.

Following this second hearing, the administrative law judge determined that Southwest Power Pool's proposed tariff revision and incorporation of the Nixa Assets were "just and reasonable." 177 FERC ¶ 63021, at p. 66180 (2021). That's because the integration's cost to Zone 10 customers of $1.8 million provided incremental integration, reliability, and power-support benefits for all Zone 10 customers. *Id.* at pp. 66187-88. In FERC-speak, it was justified under the "cost-causation principle." *See id.* at p. 66187 (cleaned up); *id.* at pp. 66180, 66203-04, 66211.

FERC unanimously affirmed, agreeing that Southwest Power Pool's incorporation of the Nixa Assets imposed a cost shift that was justified by nontrivial integration and reliability benefits for all Zone 10 customers.[3]  *See* 182 FERC ¶ 61141, at pp. 62042, 62048-50, 62054-55, 62057 (2023).  FERC then denied the non-Nixa parties' request for rehearing.  183 FERC ¶ 62048 (2023); 184 FERC ¶ 61004 (2023).  The non-Nixa parties filed a petition for review before this court.

## II. Analysis

We review FERC's decisions to ensure that they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Alabama Municipal Distributors Group v. FERC*, 100 F.4th 207, 211 (D.C. Cir. 2024).  "FERC's orders must be supported by substantial evidence, reasonable, and reasonably explained."  *Evergy Kansas Central, Inc. v. FERC*, 77 F.4th 1050, 1055 (D.C. Cir. 2023).

### A.  The Cost-Causation Principle

If a tariff rate or charge is not "just and reasonable," FERC has a duty to declare it "unlawful."  16 U.S.C. § 824d(a).  But we do not require FERC "to allocate costs with exacting precision."  *Long Island Power Authority v. FERC*, 27 F.4th 705, 712 (D.C. Cir. 2022) (cleaned up).  Instead, we rely on certain guideposts, such as the "cost-causation principle."  *Old Dominion Electric Cooperative v. FERC*, 898 F.3d 1254, 1256 (D.C. Cir. 2018).

---

[3] During this second administrative proceeding, the Nixa Assets changed hands again.  They are now owned by Missouri Joint Municipal Electric Utility Commission, but they remain under the operational control of Southwest Power Pool.

The cost-causation principle requires that customers receive benefits "roughly commensurate" to the costs they pay for a given transmission facility. *See Nebraska Public Power District v. FERC*, 957 F.3d 932, 939-40 (8th Cir. 2020) (cleaned up); *Old Dominion*, 898 F.3d at 1255-56; *Evergy*, 77 F.4th at 1055. So FERC may not force customers to pay for a facility if they do not receive *any* benefits from it. *See Illinois Commerce Commission v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009) ("*Illinois Commerce I*"). Nor can FERC force a few customers to pay the entire cost of a facility that benefits many. *See Old Dominion*, 898 F.3d at 1261.

But FERC need not use a "particular formula" or "allocate costs with exacting precision." *Id.* at 1260 (cleaned up); *cf. Long Island*, 27 F.4th at 713-14 (hybrid cost-allocation formula split 50:50 between two methods, one for local benefits and the other for regional benefits, would not violate the cost-causation principle just because a 60:40 split "one way or the other" might better reflect reality). "FERC may permissibly approve a rate that does not perfectly track cost causation, particularly if it is balancing competing goals." *Evergy*, 77 F.4th at 1055 (cleaned up).

In today's world of regional transmission organizations and integrated systems, cost allocation must account for two different kinds of benefits: "*local* benefits that accrue primarily to utilities close to the project at issue, and *regional* benefits that accrue throughout the grid." *Long Island*, 27 F.4th at 709 (emphases added). Improvements to an integrated grid that "enhance[ ] transmission security and reliability" are "presumed to benefit the entire system." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1369, 1371 (D.C. Cir. 2004) (cleaned up). So even where a local transmission facility originally served only local customers, it may have "substantial regionwide benefits" that are "difficult

to quantify" once it is integrated into a larger grid. *See Long Island*, 27 F.4th at 713-14 (cleaned up).

## B. FERC Reasonably Applied The Cost-Causation Principle

Here, FERC determined that the Nixa Assets brought "integration, reliability, and power transfer benefits to Zone 10 customers" that justified spreading their costs across Zone 10. 182 FERC ¶ 61141, at 62048 (2023); *see id.* at 62054-55. This conclusion represents a reasonable application of the cost-causation principle, a reasonable analysis of the costs and benefits that accrue to Zone 10 customers, and a reasonable balancing of the cost-causation principle with other policy goals.

The Petitioners fault FERC's analysis on three grounds: They object (1) to FERC's level of generality in considering benefits, (2) to the type of benefits considered, and (3) to the evidence of benefits in this case.

We consider and reject each of the Petitioners' objections in turn.

## 1. FERC Can Analyze Costs And Benefits At The Zonal Level

The Petitioners first claim that FERC analyzed the integration of the Nixa Assets at the wrong level of generality — at the zonal level instead of on a "customer-by-customer basis." Petitioner Br. 44. In the Petitioners' view, the cost-causation principle demands a "rough proportionality" between the cost that a *particular* customer bears and the benefit that that particular customer receives from a

transmission facility. *See* 184 FERC ¶ 61004, at p. 61017-20 (2023).

But FERC has no duty to take such a hyper-granular approach to weighing costs and benefits. Following FERC's redesign of the nation's grid, regional transmission organizations and independent system operators created local zones to manage power within the grid. Nobody challenges that zonal approach here. A key feature of that zonal system is the zonal rate that "customers located in each zone pay . . . based on the cost of the transmission facilities located in that zone." *Nebraska Public Power District*, 957 F.3d at 935. Naturally, then, when considering integration of new facilities in this zonal system, FERC reasonably analyzes costs and benefits at the zonal level.

The Petitioners contend that the cost-causation principle requires measuring the benefits of each transmission facility to each customer. But if customers paid only for the facilities from which they directly receive power, the zonal integration system would collapse, and we would return to the "bad old days" when independent, vertically integrated local utilities charged different rates to their local customers. *Midwest ISO*, 373 F.3d at 1363.

We rejected a similar argument in *Long Island Power Authority*. The petitioners there argued that FERC must "always consider cost-allocation rules on a project-by-project basis." 27 F.4th at 715. We concluded that imposing such a requirement "would unravel the framework of *ex ante* tariffs" that FERC established to move the nation toward horizontally integrated power-grid zones. *Id.* The same conclusion applies to the Petitioners' desired customer-by-customer approach here. Were we to require FERC first to identify "every customer" in each zone, then identify "every particular

transmission asset," then determine exactly how much "each asset is used" by each customer, *and then* fashion a precise proportional rate for each customer-facility pairing based on usage, the whole zonal system would come to nothing. *Southwest Power Pool, Inc.*, 184 FERC ¶ 61004, at p. 61019.

The Petitioners rely on *City of Lincoln v. FERC*, 89 F.4th 926 (D.C. Cir. 2024), but that case does not help them. In fact, *City of Lincoln* underscores the propriety of FERC's zonal-level analysis. In that case, we approved FERC's reasonable determination that it flunked cost-causation analysis to shift the costs of an asset serving load "entirely" in one zone (Zone 16) to a *different* zone (Zone 19) where that asset was physically located. *Id.* at 929, 931-33. Our analysis turned on zonal-level benefits: The asset in question benefitted Zone 16 — not Zone 19. *Id.* at 935. Here, unlike in *City of Lincoln*, the Nixa Assets benefit Zone 10, so there's no comparable cost-causation problem.

At bottom, the Petitioners' argument reduces to "rules for thee but not for me." The non-Nixa petitioners are all Zone 10 customers who draw power from facilities controlled by Southwest Power Pool and funded through the Zone 10 rate — a rate that Nixa has paid for years. As a significant customer in Zone 10, Nixa has paid a considerable share of Zone 10 transmission facility costs — a share that includes costs for facilities that primarily serve load to non-Nixa customers. So, even though Nixa itself does not draw direct, quantifiable benefits from these facilities, it has footed part of the bill. In sum, the Petitioners want Nixa to keep paying a substantial percentage of the costs of facilities that directly serve non-Nixa areas of Zone 10, while the Petitioners themselves pay no part of the facilities that directly serve Nixa. In the Petitioners' ideal world, Nixa gets double-taxed while

everyone else gets subsidized transmission. *See* Oral Arg. Tr. 16. The cost-causation principle requires no such thing.

## 2. FERC Can Consider Unquantifiable Systemwide Benefits

Next, in faulting FERC for relying on unquantified integration and reliability benefits to justify the cost shift, the Petitioners imply that the only benefits that FERC may consider in a cost-causation analysis are tangible, quantifiable benefits. They claim that because the Nixa Assets do not directly provide load to non-Nixa customers, and because FERC has no mathematical proof of how the Nixa Assets would boost grid reliability, there are no true benefits for non-Nixa customers.

That argument runs headlong into our cost-causation precedents. As we have explained, those precedents hold that system improvements that "enhance[ ] transmission security and reliability" are "presumed to benefit the entire system." *Midwest ISO*, 373 F.3d at 1369, 1371 (cleaned up); *supra* Section II.A. System integration and enhancements "have substantial regionwide benefits," even if they are not readily reducible to a dollar figure. *Long Island*, 27 F.4th at 714. These intangible or unquantifiable systemwide improvements can support an "articulable and plausible" belief that the cost shift resulting from an integration is "at least roughly commensurate with" the benefits to the system and, by extension, to the zone's customers. *Id.* at 714-15 (cleaned up).

Here, FERC found that incorporating the Nixa Assets would "provide integration, reliability, and power transfer benefits to Zone 10 customers." 182 FERC ¶ 61141, at p. 62048. True, "the benefits" of such intangible attributes "cannot be calculated with precision." *Nebraska Public Power*

*District*, 957 F.3d at 941. But precision has never been required. *See Illinois Commerce I*, 576 F.3d at 477. Qualitative benefits such as improved integration and reliability are sufficient to sustain a cost shift. *See Midwest ISO*, 373 F.3d at 1369-71. And we can hardly fault FERC for failing to quantify the unquantifiable.

Our decision today aligns with that of the Eighth Circuit in *Nebraska Public Power District*. There, our sister circuit found that the integration of another system of transmission facilities into Southwest Power Pool's Zone 17 — despite an estimated immediate cost shift of up to $4.3 million and future cost shift of up to $3.5 million — was justified under the cost-causation principle. 957 F.3d at 941. That was because the zone's utilities "were already integrated" and provided each already-integrated utility with "mutual benefit and joint use." *Id.*; *see id.* at 939-43; *cf. id.* at 941-42 ("this case more closely resembles *Illinois Commerce III*," where the Seventh Circuit approved a cost shift because of increased reliability, even though that benefit could not be calculated precisely) (citing *Illinois Commerce Commission v. FERC*, 721 F.3d 764, 774-75 (7th Cir. 2013)).

In short, as this circuit and our sister circuits have held, benefits justifying a cost shift do not need to be tangible, nor must they be amenable to precise tabulation. It's enough that there's "an articulable and plausible reason to believe" that there are benefits to integration, and that those benefits are "roughly commensurate" with the integration's costs. *Long Island*, 27 F.4th at 714-15 (cleaned up). That's the case here.

**3. Substantial Evidence Supports FERC's Decision**

Finally, the Petitioners bring a last-ditch challenge to FERC's evidence. They claim that FERC did not have

sufficient evidence to conclude that integrating the Nixa Assets into Zone 10 would provide any benefits to non-Nixa customers.

This final argument faces a high bar. FERC's decisions need only be supported by "substantial evidence," which is "more than a scintilla" but "less than a preponderance." *Delaware Riverkeeper Network v. FERC*, 45 F.4th 104, 108 (D.C. Cir. 2022) (cleaned up). The question is "not whether record evidence could support the petitioner's view of the issue," but whether there is evidence that adequately "supports [FERC's] ultimate decision." *Florida Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).

And here there is. FERC directly relied on evidence and testimony indicating that integrating the Nixa Assets would improve centralized planning and dispatch for the benefit of all Zone 10 customers. FERC also cited record evidence supporting the conclusion that integrating the Nixa Assets would provide greater reliability across Zone 10. We are satisfied that FERC's decision was supported by substantial evidence.

* * *

By examining the costs and benefits of integrating the Nixa Assets into Zone 10 at the zonal level and finding that zone-wide integration and reliability improvements justified the cost shift here, FERC reasonably discharged its rate-review duties under the Federal Power Act. We therefore deny the petition for review.

*So ordered*.